Carolyn **ORTIZ**, Plaintiff-Respondent,

v.

J. Dennis **ORTIZ**, Defendant-Appellant.

No. 25479.

Kansas City, Court of Appeals, Missouri.

Feb. 1, 1971.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 5, 1971.

Shook, Hardy, Ottman, Mitchell & Bacon, John C. Dods, Kansas City, for defendant-appellant.

T. K. Thompson, Kansas City, for plaintiff-respondent.

FLOYD L. SPERRY, Special Commissioner.

In June, 1968, plaintiff was granted a decree of divorce from defendant. She was awarded the sum of $100.00 per month as alimony. She was granted custody of the three children of the marriage, Anna Marie, Rachelle Maureen, and Matthew Jose; and defendant was ordered to pay to plaintiff the sum of $40.00 per month for each child as support. On March 29, 1969, defendant filed a motion praying modification of that decree by granting to defendant the sole care, custody and control of the children, and for such other and further orders as to the court shall be deemed just. Plaintiff also asked for modification of the support decree, praying that defendant be ordered to pay her the sum of $125.-00 per month per child and for attorneys fees and costs.

Both parties contended there were changed conditions which justified their respective claims. After some 280 tran-

script pages of evidence was heard, the court found against defendant on the issue of custody of the children and ordered that custody should remain in plaintiff, with the right of defendant to visit them at all reasonable times, after adequate notice; that defendant shall have the children with him during summer vacation from school, for one period of four weeks or, upon adequate notice, for two periods of two weeks each; that defendant shall have the children visit him, at his home, during certain holidays, to be agreed upon by the parties; that defendant pay plaintiff the sum of $50.00 per month for each child, as support and maintenance for the children; that defendant pay attorneys fees in the sum of $1,000.00; that all other conditions of the decree entered on March 12, 1968, shall remain in effect. Defendant appeals.

Defendant, in his contention that the best interests of the children require a change in custody, relies chiefly on the charge that after the divorce and custody decree was entered, plaintiff cohabited with a man named Allen Wilson, in her home, and in the home occupied by the children. He charges that Mr. Wilson was a man of a different race than that of the parties hereto and the children, that he was married, and that he was an ex-convict. It is contended that plaintiff and Wilson slept in the same bed, in a room adjoining the bedroom of the children, and that they had a joint bank account.

Defendant called plaintiff as a witness and questioned her regarding her refusal, on constitutional grounds, to answer questions regarding her relations with Wilson. The questions that were asked her on deposition were propounded to her on the witness stand. She refused to answer on advice of counsel, stating that her evidence might tend to incriminate her. She refused to answer a question as to whether she and Wilson slept together at her house. To all such questions she invoked the "Fifth Amendment". The same answer as to having had sexual intercourse with him. Plaintiff also invoked the fifth amendment, whether she had ever spent any night outside her home with one Joseph Lewis. From her refusal to answer, we will infer that defendant lived and had intercourse in her home with Wilson and that she had spent a night, or nights, with Joseph Lewis since her divorce from defendant. Harwell v. Harwell, Mo.App., 355 S.W.2d 137, 141.

▮ Plaintiff offered the testimony of Dr. Russa, a clinical psychologist, who had seen plaintiff but had never seen or talked to the children. He gave his opinion, based on notes made by what he called a "participating observer" who had visited plaintiff's home and who, by the doctor's testimony, made notes as to the behavior of the children, as she observed same. These notes were, according to the doctor, given to him by the observer. He testified, basing his testimony on said notes. Such testimony was clearly and absolutely inadmissible; it was based solely on hearsay and should not have been received. The witness was told to assume that plaintiff and her three children lived together in her home, with a man of another race, a black man, to whom plaintiff was not married, for a period of two or three months. He was then asked whether such an environment would have a detrimental effect, psychologically, on the health environment of the children. An objection to that question and his answer thereto was sustained. This was a proper ruling. On cross-examination, he stated that plaintiff told him that she was having sexual relations with Allen Wilson and that this would be an issue in litigation concerning the children. The witness knew he would be expected to testify on that issue. He stated that he was told by her that Wilson had been convicted of a crime, that plaintiff told him that Wilson partially supported her and that she had considered marrying him.

Defendant testified. He gave the ages of the children as follows: Anna 8, Rachelle 5 and Jose 3. He stated that in April, 1968, plaintiff left the family home in Kansas City and moved to an apartment in

Kansas; that he retained custody of the children until July, 1968, which was after the divorce was granted, at which time custody was awarded to plaintiff; that he is now buying a home in Kansas City; that he is temporarily in Michigan, taking a training course in services for the deaf; that he received a bachelor's degree in education and, later, received a master's degree in "deaf education and audiology"; that he was, for a time, executive director of the Greater Kansas City Housing and Speech Center for a period of nine years for which he received salary of $12,000.00 per annum.

He has a master's degree and also its equivalent in audiology. He plans to eventually enter private practice in Kansas City and to establish a center for the deaf. He was at the time of the trial, receiving compensation of $700.00 monthly. He is now remarried to a woman who was never previously married and there are no children by this marriage. He is a communicant of the Catholic Church. When the children were with defendant, after the separation, they lived in his home and the oldest went to school and church. He stated that, when the divorce was granted, he felt that plaintiff could care for the children; after plaintiff really took custody of the children he expressed "deep concern, they didn't understand the relationship between a man that was living there, they didn't understand the significance of why a person of another race would be living in the home. * * * They seemed to know that mother was actually sleeping with that man and they didn't understand it." Eventually, plaintiff and the children moved to Omaha, Nebraska, but did not inform defendant thereof. He finally learned of this move from a former babysitter. Since the divorce, plaintiff has lived at four different places in Missouri, Kansas and Nebraska.

Esther Ryan Ortiz, defendant's present wife, testified that she was an employee, for some years, at Kansas City General Hospital Speech Center, where defendant was employed. She then took a master's degree in special education at Illinois University and returned to her former employment, as a supervisor. She is not now employed but is with defendant while he is in school in Michigan. She stated that she has had a number of visitations with defendant's children; that they seemed to be concerned and upset regarding relations between Wilson and plaintiff; that she could accept the children in her home, and, if necessary, not work in order to care for them; that she loves them. She stated that "in March" (1969) the children said that Wilson was no longer in their mother's home. She stated that she and defendant occupy a seven room home in Michigan where he attends school.

It was shown by plaintiff's deposition that she admitted that Wilson supported her for three months; that they maintained a joint bank account for some four months; that, for a period of time, Wilson spent five nights per week in her home; that he was, during that period of time, married; that he kept some of his clothes at her house; that he used her car; that he stayed at her house from December, 1968, until March, 1969; that, after this custody case was filed, she and Wilson decided that he should move out of the house; that he continued coming to the home from time to time; that she also saw him away from her house; that she told defendant and her children that she would marry Wilson; that she dated him until mid-August, 1969; that she dated Mr. Lewis, a black man, and considered marrying him; that she believed that, when she and Wilson were living together, it was a good environment for the children; that defendant had never mistreated the children and had adequately provided for them. Plaintiff had testified at the divorce hearing that defendant was a good father to the children.

Mrs. True, mother of plaintiff, stated that plaintiff and the children live in her four bedroom modern home, in a good neighborhood, in Omaha, Nebraska. That she has been employed for ten years at Nebraska Psychiatric Center; that, prior to March, 1969, she had occasionally seen the children; that they seemed to be relaxed

and at ease with Wilson; that the children now attend Unitarian Church; that they are very happy; that plaintiff is not working; that plaintiff, Wilson and the children visited witnesses's home about Christmas time, 1968; that plaintiff discussed with witness her possible marriage to Wilson; that plaintiff has had psychiatric consultations at Omaha; that plaintiff told witness that Wilson had lived in their home in Kansas City. She testified to the effect that she did not believe it to be "good" for the children to live in a home where Wilson lived with plaintiff.

Mrs. Foote, who lived in Omaha, testified that she knew plaintiff; that plaintiff told her that she had lived with Wilson; that she had sexual relations with him; that he was married and that he had been convicted of the crime of robbery.

Plaintiff testified to the effect that Wilson lived in her home from December until February, 1969; that the children knew this fact; that she has seen a psychiatrist in Omaha from ten to fifteen times; that, about a month after meeting him, she learned that Wilson was married and had served time in prison for robbery. When asked if she felt that her conduct and relationship with Wilson was morally wrong she answered that she did not feel that it was; that she first met him December 1, 1968; that, a month later she learned that he was married; that she learned that he had been convicted of a felony. She stated that when she answered interrogatories, that no adult male had lived in her house, that this was false; that she slept with Wilson and had sexual intercourse with him; that she loved Wilson and had lived with him in the home as husband and wife, sharing a bedroom; that she knew, beforehand, that her conduct would have a substantial effect on the children; that she did not believe it would have a bad moral effect on the children; that she had no concern for the moral impact on the children; that her conduct was not in accordance with general moral standards.

We have stated the facts extensively because we cannot approve the judgment of the trial court and feel that we should fully demonstrate our reasons therefor.

Here, plaintiff has been guilty of gross immoral conduct. She has not demonstrated that she is now repentant. She met a man and, within two weeks, she took him into her house and bed. They lived as husband and wife and her children knew of that relationship. Within a short time, she learned that this man was married and that he had been convicted of a felony, robbery. She continued to live with him. They finally ceased living together, not because she became repentant, but because defendant filed this modification of custody proceeding. She knew that her conduct would have a strong impact on her children but her philosophy, as expressed herein, is that acts which, in the opinion of "middle class" society, may be immoral are not immoral to her if she wants to indulge in such acts and conduct. She believes that every one, including her children, should develop and practice the kind of morality that he or she sees fit to practice. Such is not the standard of morality that has been announced as desirable by the courts of this state when considering child custody matters.

■  The morals of the respective parents are an appropriate subject of consideration in a child custody case, and grossly immoral conduct of the mother will justify denying her the custody of her child. M. L. v. M. R., Mo.App., 407 S.W.2d 600, 602. Where the evidence clearly showed that the mother had become a person contemptuous of the law and moral standards by living in open adultery she was denied custody. Hoffmann v. Hoffmann, Mo.App., 395 S.W.2d 277, 278. Where there was circumstantial evidence tending strongly to prove adulterous conduct on the part of a mother, after separation and prior to divorce, she was denied custody of her small child. Harwell v. Harwell, Mo.App., 355 S.W.2d 137, 143.

This evidence reveals beyond a shadow of a doubt that plaintiff is so grossly immoral that she cannot even understand that her conduct is the proper subject of censure. She realized that her conduct would have a substantial effect upon the children but this in no way deterred her from indulging her own personal selfish whims and desires. The record also discloses that plaintiff has, in this litigation, pursued a deliberate and studied course of false swearing and has resorted to the truth only when she could no longer escape it. Only one conclusion is possible from a consideration of this record: that plaintiff is entirely unfit to have custody of the minor children of the parties and that their best interest demands that they be removed from the custody of the mother and delivered into the custody of the father. Consequently, your Special Commissioner recommends that the judgment be reversed upon such terms as the court may prescribe.

### PER CURIAM:

The foregoing opinion by FLOYD L. SPERRY, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is reversed (except as hereinafter noted) and the cause is remanded to the trial court with directions that it enter an order granting custody of these three children to defendant. This direction shall not foreclose the right of the trial court to grant plaintiff reasonable visitation rights or rights to temporary custody for reasonable periods, but such rights shall be granted by the trial court only upon a new and affirmative showing by the plaintiff that she is now a fit person to have such rights and that the children will not again be exposed to conditions detrimental to their welfare, such as this record shows existed in plaintiff's home in the past. That part of the trial court's order granting plaintiff $1,000.00 for attorney's fees is hereby approved and affirmed.

All concur.