In re the MARRIAGE OF P.I.M., Petitioner-Respondent,

and

T.D.M., Respondent-Appellant.

No. 12912.

Missouri Court of Appeals, Southern District, Division Three.

Jan. 31, 1984.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 21, 1984.

George W. Gilmore, Jr., Gilmore, Gilmore, Taylor & Burns, Sikeston, for petitioner-respondent.

Donald Rhodes, Bloomfield, for respondent-appellant.

PER CURIAM.

On November 24, 1981, T.D.M., Sr., father, sought a modification of a dissolution decree entered July 26, 1979, wherein P.I.M., the mother, received custody of the two minor sons of the parties.

Two years prior to the filing of this action, by agreement between the parties, the older of the two boys, T.D.M., Jr., who was 12½ years old, began residing with the father, but continued to visit in the mother's home. At that time, the younger son, J.D.M., 6 years old, continued to reside with the mother.

In his motion to modify, the father alleged that there had been a substantial change in circumstances of the parties and the minor children since the decree of dissolution and listed the following six specifics in his petition: 1) that he now has custody of the oldest son; 2) that the younger boy (now 8 years old) wishes to live with him; 3) that the mother has permitted various men to reside with her and the children; 4) that the mother has kept obscene material in the home available to the children; 5) that the mother's boyfriends have had fights at the mother's dwelling, thus jeopardizing the safety of the children; and 6) that in the best inter-

ests of the children custody should be changed from their mother to him.

On June 21, 1982, a hearing on the motion was held. After hearing all of the evidence, the trial court found that there had been a change of circumstances with regard to the oldest child and awarded his custody to the father, due to the parties having stipulated and agreed to such, but "finds that there has not been a change of circumstances so as to warrant a modification of custody of the youngest child," and decreed that custody of J.D.M. remain with his mother. The trial court taxed all costs against the father, including an expert witness fee to Dr. Briner, the director of the Southeast Missouri Regional Crime Laboratory, and a fee to the laboratory for expenses in processing a substance believed to be marijuana.

The father appeals on a number of grounds, among which is the contention that the findings and judgment of the trial court 1) were against the greater weight of the evidence, 2) amounted to an abuse of discretion on the part of the trial court, and 3) were contrary to the best interest and welfare of the minor child, J.D.M. Other points relied on refer to the exclusion or admission of evidence and the taxing as costs of the fees awarded to Dr. Briner and the laboratory.

We first address the question of whether the trial court's finding that there had not been a change of circumstances sufficient to warrant a change of custody of the youngest boy was against the weight of the evidence, or if such finding was based on an erroneous declaration or application of law. From what we can glean from the record and respondent's brief, the trial court was of the opinion that, even if the mother had engaged in immoral conduct since the date of the dissolution decree, as long as such conduct did not occur in the presence of the youngest child, his welfare was not affected.

■ In deciding this question, we keep in mind that child custody is not a permanent status, but may be changed when dictated by a change of conditions and circumstances affecting the child's welfare [*In the Interest of K.P.B.,* 625 S.W.2d 692, 695 (Mo.App.1981) ], that such change must be significant [*Dorris v. Dorris,* 623 S.W.2d 47, 48 (Mo.App.1981) ], and that the moving party has the burden of proof to show such significant change [*Knoblauch v. Jones,* 613 S.W.2d 161, 166 (Mo.App. 1981) ]. We further observe that where there are charges and proof of gross immorality on the part of a custodial parent, and such immorality takes place in the home in which the child is kept, it is not necessary to wait for manifestation of harmful consequences to the child before action is taken. It is more sensible to change a child's custody when there is a reasonable likelihood of an adverse effect on the child if he is kept in his present surroundings than to wait until damage is done and then attempt to repair that damage. *Ryan v. Ryan,* 652 S.W.2d 313, 316 (Mo.App.1983); *Mansell v. Mansell,* 583 S.W.2d 284, 286–287 (Mo.App. 1979). We also opine that in deciding child custody matters, no single consideration is more important than the home environment in which the child will live. *Rogers v. Rogers,* 430 S.W.2d 305, 311 (Mo.App.1968). We also note that the morals of the respective parents are an appropriate subject for consideration in child custody matters, and that grossly immoral conduct on the part of the child's custodian justifies denying custody to that parent. *Ortiz v. Ortiz,* 465 S.W.2d 662, 665 (Mo.App.1971).

■ Based on the legal precepts cited by us, the issue boils down to the question of whether the mother's lifestyle, since the dissolution decree, is adversely affecting the welfare of the youngest boy. The trial court, in effect, held that it was not. That finding and the ensuing judgment, denying the father's motion, was against the weight of the evidence, is not supported by substantial evidence, was based on an erroneous declaration and application of law, and constituted an abuse of discretion on the part of the trial court.

The mother, a 33 year-old secretary, employed full time, lives in a three bedroom home which should be suitable as a resi-

dence for herself and her youngest son. She does the cooking, cleaning, and housekeeping, and the child is adequately fed, clothed and sheltered while in her care. Her moral standards, however, are grossly deficient from those required of the custodian of a child of impressionable years.

The greater weight of the credible evidence in this case shows that after the dissolution decree, the mother moved into an apartment and then into her present home. She developed a liaison with L.D.M. and had sexual relations with him on numerous occasions. One morning, he went to her home about 8 A.M. "to take a shower" and saw the mother coming out of a bedroom with another man. An altercation ensued between the two men and her bedroom companion fired a shot in the air to frighten L.D.M. away from a pistol he evidently kept in the mother's home. The youngest boy was not in the home when this incident happened, but the shooting became common knowledge.

The mother then developed a relationship with C.M.T., a married local businessman. During periods of separation from his wife, C.M.T. would move his clothing and other belongings into her home. He spent the night in her home on several occasions when her youngest son was there, and there is strong circumstantial evidence that he shared her bed on at least one of those occasions, and her sons knew it. During a trip to Jefferson City with C.M.T., his 15 year-old daughter, and the two boys, the two adults drank a bottle of wine. The daughter testified P.I.M. "passed out" after drinking the wine. P.I.M. admitted drinking the wine, but denied passing out.

Friction developed between the two sons and their mother's paramour. On one occasion, while the oldest son was visiting his mother, C.M.T. cursed the boys during a family argument. The oldest boy put his little brother on the back of his bicycle and took him to their father's farm. An argument erupted between the father and mother over returning the little boy to her custody. The youngest son wanted to live with his father and brother and, on occasion, would refuse to go back to his mother after visits with his father. This resulted in further bickering and hard feelings between the parents.

On another occasion, while the oldest son was visiting, the two boys were instructed to make their mother's bed. While tucking the sheets between the mattress and springs, the boys found a plastic bag containing a dried, leafy substance. The boys took the bag to their father who took it to the sheriff. The sheriff, an experienced law enforcement officer, felt and smelled the leafy substance, believed it to be marijuana, and sent the bag and its contents to the Southeast Missouri Regional Crime Laboratory, where the contents were examined by Dr. Robert Briner. The substance in the bag was marijuana.

Prior to the discovery of the marijuana by the boys, the oldest son, upon approaching his mother's bedroom door, noticed a "funny smell." The mother explained this by saying she had lit the wrong end of a cigarette. At trial, the mother denied ever having marijuana in her home, but had told one of her witnesses, a social worker, that she had kept marijuana in her home.

The mother also kept sexually explicit magazines, such as "Hustler," in a magazine rack that also contained the little boy's coloring books and crayons. These magazines contained photographs and cartoons of naked men and women engaged in a variety of sexual acts, including sodomy, and bestiality. She also kept a projector and hard-core pornographic films in her home, which she watched with her boyfriend in the living room, during times when the boys were banished to a bedroom. The boys never were permitted to view the films but did see the boxes in which the films, which they found on their mother's dresser, were stored. Both of the boxes had color photographs of males and females engaged in sexual intercourse on the box covers. This court has viewed both films which were in evidence. The films are hard-core pornography, and are composed, almost entirely, of scenes depicting

masturbation, sexual intercourse, and sodomy. The mother, in her testimony, admitted possessing pornographic films and sexually explicit magazines in her home.

While it is not our function to formulate codes of moral conduct, and although we do note that certain conduct once viewed by society with disgust does not carry the same social stigma that it did in years gone by, we have reached a firm conclusion that the mother's moral code and conduct, as shown by the evidence cited, does have and will continue to have a detrimental effect on her youngest son during the years when his character, virtues, and moral values are being formed, and that the moral environment in her home is not suitable for the raising of a child of impressionable years. The change of circumstances shown by the evidence, brought about by the mother's lifestyle, mandates a change of custody of the youngest son.

There is substantial and conclusive evidence to show that the father would be a suitable custodian of the youngest child. The father, who has not remarried, is a 35 year-old, self-employed, grain farmer who lives with the oldest son in a modern, three bedroom home on the family farm. The father wishes custody of his son and the little boy wishes to live with his father and brother. The house cleaning and laundry are done by the father's sister, and the meals are prepared by the father's mother who lives ⅛ mile from the father's home. The boys get along well with their father. He fishes and hunts with them, takes them to the movies, and attends their baseball games. He helps the oldest son with his homework, disciplines the boys when they need it, requires the boys to develop good work habits, and attends church regularly with the oldest son.

Most of the evidence detrimental to the father concerned his relations with his former wife. She testified that on several occasions he refused to return the youngest child to her custody after visitations, prevented her from talking to the oldest son, that he had struck her in the presence of the youngest son, which he admitted, after she had called him a son of a bitch which, in his words, "put the icing on the cake." She also testified that he had been somewhat dilatory in her child support payments, although the record indicates that he was not in arrears at time of trial.

The father's conduct referred to above was certainly not admirable, and reflects the rather common syndrome of ex-mates letting their personal differences spill over to the point where they affect the mental health and welfare of their children. Even so, while not perfect, the father's home environment for raising the youngest son is superior to that of the mother's, and we find nothing in the record to suggest that he would not be a proper custodian of his youngest son. The father's motion for change of custody should have been sustained, and the trial court committed prejudicial error in finding no change in circumstances and in denying the father's motion to modify.

The father's next meritorious point concerns his allegation that the trial court erred in awarding Dr. Briner a $500 witness fee plus $55 expenses and in awarding the Southeast Missouri Regional Crime Laboratory the sum of $100, presumably expenses for analyzing the contents of the bag brought to the laboratory by the sheriff.

Dr. Briner's sole appearance at trial was to testify at a hearing on his own motion to quash a subpoena issued to him, in which hearing he advanced the proposition that since this case involved civil matters, it was an abuse of his time as well as the laboratory's, to process the material in question, and to give an opinion in report form, that the substance examined was marijuana. Even if his thesis held water, which we doubt, as possession of marijuana by the mother would be a criminal act, and it seems to us that any laboratory tests done on suspected controlled substances would necessarily involve a criminal investigation, there is nothing in the record to show that the father ever asked Dr. Briner, or anyone at the laboratory, to test the substance in question or to testify as an expert witness

concerning it for an agreed fee or on a quantum meruit arrangement.

On our own motion, we have supplemented the record so that it includes a "corrected statement of costs" for this case from the circuit court file which shows fees and expenses to Dr. Briner of $555 and a $100 fee to the laboratory. The record, however, does not contain any trial court order allowing the amounts in question as costs. Since county law enforcement authorities, on their own initiative, took the substance in question, which turned out to be marijuana, to the laboratory for testing, the fact that the father later tried to use the result of the testing to show his ex-wife was committing criminal acts by possessing marijuana in her home, does not justify taxing the costs of such testing, and expert witness fees for the person conducting the test, against the father. This would be true even if the amounts claimed were properly proved, which is not the case here.

If Dr. Briner, when summoned by the father, had appeared and testified as a witness for the father, he would have been entitled to a statutory witness fee and mileage. The record indicates that his only appearance was to testify as a witness on his own motion to quash the subpoena issued to him. The claimed fees and expenses of Dr. Briner and the laboratory are ordered stricken from the corrected statement of costs.

■ The father's final point contends that the $1,000 awarded the mother's attorney was excessive. We have examined the record and find that it was not.

Since the father is in a better position to pay the legitimate court costs of this action and his ex-wife's attorney fee, he should do so.

■ While ordinarily we would remand the cause to the trial court for entry of a proper decree consistent with this opinion, in the interest of judicial economy and to resolve this child custody wrangle without further harm to the youngest son, we exercise our judicial prerogative and enter the judgment the trial court should have entered under the facts of this case. Rule 84.14, V.A.M.R.

The findings, conclusions, and judgment of the trial court are reversed and ordered stricken, and the cause is remanded to the trial court with directions to enter the following orders and judgment. "Respondent's, T.D.M., motion for modification of order of child custody is sustained. Custody of minor children, T.D.M., Jr. and J.D.M., ordered transferred from petitioner, P.I.M., to respondent, T.D.M. Petitioner's counter-motion to modify denied. Respondent relieved of the obligation of paying child support for J.D.M. as of February 1, 1984, and of T.D.M., Jr., as of December 14, 1979. Petitioner awarded reasonable visitation rights with T.D.M., Jr. and J.D.M. away from the home of T.D.M. Respondent ordered not to impede or interfere with petitioner's exercise of her visitation rights. Petitioner awarded $1,000 attorney fees. Court costs, with the exception of the claimed fees and expenses of Dr. Briner and the Southeast Missouri Regional Crime Laboratory assessed against respondent."

All concur.