Jeffrey NEWSOM, Respondent,

Guardian Ad Litem, Respondent,

v.

Brandy NEWSOM, Appellant.

No. WD 54108.

Missouri Court of Appeals, Western District.

Aug. 11, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 22, 1998.

Joe Holt, Holt, Mays & Brady, Fulton, for respondent.

Mary Moore, Guardian Ad Litem, Columbia, for respondent.

Before BRECKENRIDGE, P.J., SPINDEN and RIEDERER, JJ.

BRECKENRIDGE, Presiding Judge.

Brandy Newsom (Wife) appeals the trial court's judgment dissolving her marriage to Jeffrey Jay Newsom (Husband). She contends that the trial court erred by awarding Husband primary physical custody of the parties' son. She also claims that the trial court misapplied the law in calculating the child support award because it failed to include the cost of health insurance coverage for the minor child. Additionally, Wife argues that the trial court erred in failing to restore her maiden name. Because this court finds that the trial court's physical custody award was against the weight of the evidence, that portion of the judgment of dissolution is reversed and remanded. Accordingly, the child support and visitation awards are also reversed and remanded. Although this court affirms the trial court's failure to restore Wife's maiden name, as Wife never requested in a pleading that the court restore her maiden name to her and the issue was not tried by consent of the parties, the trial court is directed to allow Wife to amend her pleadings to include a request to restore her maiden name and consider the issue on remand.

■ On appeal of a judgment in a dissolution of marriage proceeding, this court reviews the evidence in the light most favorable to the trial court's decision. *Replogle v. Replogle*, 903 S.W.2d 551, 553 (Mo.App.1995). Husband and Wife were married on December 31, 1994, in Stevensville, Montana. They moved to Missouri in June of 1995. They have one child, Tyler Jeffrey Newsom, who was born on August 1, 1995. At the time of separation, Husband and Wife resided in Auxvasse, Missouri.

The separation occurred on January 2, 1996, when Husband took five-month-old Tyler out of the marital residence after telling

Nancy A. Beardsley, Cochran, Oswald, McDonald, Roam & Moore, PC, Blue Springs, for appellant.

Wife he was going to run errands. Husband filed an application for an ex parte order of protection which was served on Wife that same day while Husband and Tyler were out of the house. Pursuant to the ex parte order, Wife was directed by deputy sheriffs from the Callaway County Sheriff's Department to leave the marital residence. When the deputies were removing Wife from the marital residence, they found Wife's loaded gun on her nightstand. Husband knew about the gun and had complained to Wife about it. According to Husband, Wife kept the gun loaded and cocked, and had pointed it at him on one occasion.

The day after the ex parte order of protection was served, Husband filed his petition for dissolution of marriage. Subsequently, the trial court denied Husband's application for a full order of protection, and ordered custody of Tyler returned to Wife. After the full order of protection was denied, Wife, escorted by the deputy sheriffs, went to Husband's sister's residence to pick up Tyler. According to Husband, when Wife was told that she could not have custody of Tyler because Husband had filed his petition for dissolution while Tyler was in his custody, Wife began shouting, cursing, making obscene finger gestures in front of Husband's sister's children and Tyler, and it took ten police officers to restrain her and make her leave.

Thereafter, Wife filed a counter-claim for dissolution of marriage and an application for an ex parte order of transfer of temporary custody of Tyler. On January 29, 1996, a hearing was held on Wife's application for temporary custody. The trial court awarded temporary custody of Tyler to Husband. After the temporary custody hearing, Wife moved back to Montana to live with her parents and Justin, her ten-year-old son from a previous relationship. Wife obtained court-ordered visitation with Tyler on two occasions before the trial. On the first visit in July, Wife took Tyler to Montana for three weeks. The second visit took place in September in Fulton, Missouri and lasted for one week.

On December 5, 1996, a trial was held on the parties' petitions for dissolution of marriage. Husband testified that he had health insurance benefits available for Tyler through his employment, but that he had not obtained it yet and that Tyler was receiving Medicaid benefits. Wife testified that she too had health insurance benefits for Tyler available through her employment in Montana at a cost of $172 per month total for herself, Justin, and Tyler.

The trial court entered an order dissolving the parties' marriage and awarding the parties joint legal custody of Tyler with primary physical custody to Husband. Wife was awarded reasonable rights of visitation, including, if she lives in a state other than Missouri, six weeks during the summer, two weeks at Christmas, and one week during March or April. However, if Wife resides within 50 miles of Husband's residence, the court ordered her visitation to be on alternate weekends, Wednesday evenings, alternate holidays except Father's Day, seven days at Christmas, and two two-week periods in the summer. The court prepared its own Form 14 and ordered Wife to pay child support in the amount of $167 per month. The cost of Tyler's health insurance was not included in this calculation. Wife filed a timely appeal to this court.

### The Physical Custody Award is Against the Weight of the Evidence

In her first point, Wife alleges that the trial court erred in awarding primary physical custody of Tyler to Husband. Tyler's guardian ad litem, appointed because of Husband's allegations that Wife failed to use a car seat for Tyler, also contends that the trial court's physical custody award is against the weight of the evidence. This court will affirm the custody determination of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence or the trial court erroneously declared or applied the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *Flathers v. Flathers,* 948 S.W.2d 463, 465 (Mo.App.1997). The appellate court affords the trial court greater discretion in determining child custody than in other matters. *Flieg v. Flieg,* 884 S.W.2d 347, 348 (Mo.App. 1994). Where evidence on an issue is disput-

ed, or where there is contradictory evidence, this court defers to the trial court's credibility determinations. *Hankins v. Hankins,* 920 S.W.2d 182, 188 (Mo.App.1996). A trial court's determination of custody will not be disturbed on appeal unless the appellate court is firmly convinced it is erroneous and the award is against the child's best interests and welfare. *Flathers,* 948 S.W.2d at 471; *In re Marriage of Douglas,* 870 S.W.2d 466, 469 (Mo.App.1994).

Section 452.375.2, RSMo Cum.Supp.1997, lists eight factors for the trial court to consider in determining custody in accordance with the best interests of the children. These eight factors are:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of a child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school, and community;

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved …;

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) The intention of either parent to relocate his residence outside the state; and

(8) Which parent is more likely to allow the child frequent and meaningful contact with the other parent.

In this case, both parents sought custody of Tyler. Considering that Tyler was only 16 months old at the time of the trial, there was no evidence concerning his wishes as to his custodian pursuant to factor (2). As for factor (3), Husband testified that his family lives in the area and Tyler interacts frequently with his cousins and other relatives. Husband argues that this factor must favor him because his numerous relatives who live in close proximity to him had contact and a "full year of relationship" with Tyler during the parties' separation.

Husband's family had a "full year of relationship" with Tyler to the exclusion of Wife and her family through the concerted efforts of Husband and his family to limit any contact Wife and her family had with Tyler. Husband testified that he did not provide Wife his telephone number because he was afraid she might try to use it for third party calling, and she had his mother's and sister's number if she needed to reach him. However, when Wife's mother called Husband's mother and sister three times attempting to inquire about Tyler in February of 1996, they hung up on her. After these three conversations, which lasted for a combined total of 2.6 minutes, there were telephone harassment complaints filed in Montana against Wife's mother. Although Husband's sister Tami testified that "about every two weeks" she sent letters to Wife telling her what Tyler was doing, when Wife sent certified letters to Husband, Husband's mother and Tami asking about Tyler, Wife's letters were sent back refused.

Moreover, there was evidence that Tyler's extensive contact with Husband's family could be detrimental to Tyler. Husband testified that his sister Tami babysits Tyler four days a week, and that Tyler frequently socializes with her three children. However, Wife testified that Tami's children, with whom Tyler clearly spends a great deal of time, use profanity, including the "F word," have violent tempers, and commonly tell people they are going to kill them. Tami's children were only ages four, five and ten at the time of trial. Husband's mother testified that she heard Tami's children use profanity. Husband's sister-in-law, Rhonda Newsom, also testified that Tami's children use profanity, including the "F word," but that they are getting better. Tami even testified that although her children do not use a lot of profanity, she was sure they have used profanity, "just as most children" have.

In addition, placement of Tyler with Husband separates him from his half brother, Justin. There was little evidence that Tyler's interaction with his half-sibling Justin would have detrimental effects on Tyler's

behavior. Justin, who was ten years old at the time of trial, testified that he makes mostly A's and B's in school, is eager to have Tyler live with him, and loves Tyler very much. In addition, Husband has a brother and his family in Montana, so Tyler would have the ability to have contact with members of Husband's family if he lived in Montana. Factor (3), the interaction and interrelationship of the child with those persons who may significantly affect his best interests, weighs equally in favor of either Husband or Wife having custody of Tyler.

The next factor the court is to consider pursuant to § 452.375.2, RSMo Cum.Supp. 1997, is Tyler's adjustment to his home, school, and community. Again, considering Tyler's young age at the time of trial, this factor is not relevant to this case. As to factor (5), the mental and physical health of all individuals involved, including any history of abuse, there was no evidence of physical abuse by either Husband or Wife. The evidence weighing in favor of Husband on the issue of Tyler's mental health was the testimony of Dr. Pierce, Tyler's pediatrician, that "on a theoretical basis one might have concerns about the disruption" of Tyler's bonding with Husband and Husband's family if custody was awarded to Wife.

There was undisputed evidence, however, that Husband's behavior towards Justin, his stepson, was emotionally abusive. This evidence is indicative of Husband's conduct as a parent. Justin testified that on one occasion after he had just taken a bath, he was getting dressed when Husband walked into his room. Justin was wearing only a t-shirt, and was not wearing underwear. Husband took a picture of Justin, semi-nude, and told him he was going to show it to Justin's female cousin. Afterward, Husband told Justin that the camera did not have any film in it. Husband admitted that this incident occurred. Husband also testified that Justin used to call him "Dad," but he told Justin not to call him that because Justin was not his son, and Justin did not treat him like a dad; therefore, he did not need to treat him like a son. Wife testified that Husband never allowed Justin to walk into their bedroom. Husband justified his behavior toward Justin by testifying, "Well, you can't love, I don't think you can love a stepchild as much as you can your own."

In his brief, Husband contends that this factor weighs in favor of Husband because of the type of parent Wife is to Justin. Husband argues that because Justin is overweight, watches NASCAR racing on television, did not like going to school in Missouri, and went to live with his grandparents in Montana three months prior to the separation rather than live with Husband and Wife, Wife is a bad parent to Justin. Husband argues that this shows Wife will be a bad parent to Tyler.

Wife testified that Justin is overweight due to poor eating habits, but is being treated by a physician, a nutritionist, and is undergoing occupational and physical therapy. As for his not liking school in Missouri, Justin testified that the other students picked on him and called him fat. Finally, considering Husband's treatment of Justin, Wife's sending Justin to live with his grandparents in Montana was not evidence of Wife's bad parenting. The evidence on this factor weighs in favor of Wife.

On factor (6), the trial court is to consider the needs of the child for a continuing relationship with both parents and the ability and willingness of the parents to actively perform their functions as mother and father for the needs of the child. Both Husband and Wife testified that they were Tyler's primary care-giver prior to separation. Other evidence on this factor was that after the separation and before the trial, Husband took Tyler to the doctor and provided for him while he was in his custody. During the separation, Husband took a five-week parenting class that met once a week for two hours. Husband also sought the advice of Tyler's pediatrician, Dr. Pierce, regarding Tyler's diet. Dr. Pierce testified that Tyler was current on all of his immunizations, and that Husband was prompt when bringing Tyler in for appointments.

Husband also testified that after Wife's two court-ordered visitation periods with Tyler during the separation, Tyler was terribly constipated, unwilling to eat, he clung to Husband for a week after the visits, and his

teeth were dirty after one of the visits. Dr. Pierce testified, however, that Tyler has had a problem with constipation since birth. Dr. Pierce also testified that the fact that Tyler clung to Husband after having been with Wife for visits was normal, and he was "not alarmed in any way" about the condition of Tyler's teeth after the visit with Wife.

Additionally, Husband presented testimony regarding Wife either not using a car seat for Tyler or not using it properly. Husband testified that sometimes he saw Wife transporting Tyler without a car seat, and instead holding him on her lap. Husband said that he complained to her about it, but it would just start a fight and Wife would continue to hold him on her lap. In contrast, Husband testified that he always uses a car seat. Brian Coleman, a contractor who built a garage at Husband's parents' house during November and December of 1995, testified regarding Wife's improper use of Tyler's car seat. Mr. Coleman testified that during this time, he observed Husband, Wife and Tyler together on approximately twelve to twenty-four occasions. He observed Wife putting Tyler in her car without buckling the car seat to the car on four to five occasions. Mr. Coleman also testified that when Wife was with Husband, Tyler was not dressed appropriately for the cold weather and Tyler's nose was running. On the two or three occasions when Husband and Tyler were there without Wife, Mr. Coleman observed that Tyler was dressed appropriately and his nose was not running.

Husband was present when Wife did not use a car seat, and he admitted that he was driving the car when Wife held Tyler on her lap instead of using a car seat. When Husband was asked on cross-examination why he drove the car anyway, his response was, "What was I supposed to do, just not go nowhere?" After the separation, when Wife picked up Tyler for the July visit to take him to Montana, Husband refused to give Wife Tyler's car seat to use for the trip. When Husband was asked why he refused to give it to her, he testified, "that's Tyler's car seat.... I didn't know what she was doing. She was flying or what." Although this court does not condone Wife's failure to use a car

seat when transporting Tyler, Husband's behavior indicates more of a willingness to make Wife look bad rather than to provide for the needs of his son.

On Factor (7), the intention of either parent to relocate outside of Missouri, the evidence was that Husband and Tyler continue to reside in the marital residence, while Wife is living in Montana with her parents and her son Justin. She has a job in Montana, plans to attend college there, and is looking into obtaining housing. Husband argues that this factor must favor him because there is no indication that Wife intends to move back to Missouri. It must be noted, however, that Husband and Wife met and married in Montana, where Husband had lived for fifteen years and Wife had lived for two. According to Wife, she and Husband had planned to move back to Montana, and both had retained their Montana driver's licenses. Husband and Wife had lived in Missouri for only five months when Wife was excluded from the marital residence by an ex parte order which was not proven after a hearing, as the trial court denied the full order of protection and ordered custody of Tyler back to Wife. After being excluded from the family home, Wife was living in a motel and was unemployed. She knew no one in Missouri besides Husband and his family. Wife's intention to relocate Tyler outside of Missouri, where she has no ties whatsoever, to Montana, where both Husband and Wife had lived and where Wife's family and Husband's brother resides, is not sufficient to justify the trial court's custody award to Husband.

Finally, there was much evidence presented to the trial court regarding factor (8), which parent is more likely to allow the child frequent and meaningful contact with the other parent. The fact that Wife took Tyler and went to Montana for one week in November of 1995, before the parties separated, made Husband concerned about his custody and visitation rights with regard to Tyler. Husband also argues that because Justin had not seen his biological father for four years, and Wife had told Husband that if Justin's biological father ever tried to obtain custody of Justin she would have her parents take

Justin away, Wife has a "deep seated fear concerning visitation."

Wife denied making the statement regarding having her parents take Justin away if his biological father attempted to obtain custody of him. However, this court will defer to the trial court's determination of credibility of the witnesses. *Hankins,* 920 S.W.2d at 188. Even accepting Husband's testimony as true regarding this statement by Wife, the undisputed evidence was that the reason why Justin had not seen his biological father in four years was because his father was in the Army and stationed in Germany. Justin testified that he writes letters to his father and receives letters from him, and that his mother has never told him that he could not see his father or write to him. There is no evidence to support Husband's allegation that Wife has a history of denying Justin's biological father visitation.

■ Moreover, Husband's conduct throughout the parties' separation and his testimony at trial indicates that he is the parent with a "deep-seated fear" of visitation. He admitted that he did not provide Wife with his phone number and refused certified mail from her. In his letter explaining why he was leaving her, Husband told Wife not to call him or his family and not to come to the marital residence. His family testified that they refused certified mail from Wife and would not take phone calls from Wife's mother inquiring about Tyler's welfare. Husband further admitted that he "has not attempted to facilitate visitation" between Wife and Tyler since the parties separated, and that he has made Wife go to court in order to obtain visitation. "A parent's history of denying the other parent meaningful contact with a child may be considered in determining the child's physical placement." *Rinehart v. Rinehart,* 877 S.W.2d 205, 208–09 (Mo.App.1994). In this case, the uncontradicted evidence was that Husband consistently and purposefully denied Wife contact with Tyler throughout the parties' separation. Considering Husband's behavior during the separation, a finding that Husband would be more likely to allow meaningful contact between Tyler and Wife is against the weight of the evidence.

■ In addition to these factors, the character of a parent is a proper subject for consideration by the trial court in determining the custody of a child. *Hack v. Hack,* 695 S.W.2d 498, 500 (Mo.App.1985). "A good environment and a stable home is generally considered as the most important single consideration in custody cases." *R v. R,* 685 S.W.2d 598, 602 (Mo.App.1985). In *R v. R,* the Southern District of this court further stated:

> [A]dverse consideration of past or present inappropriate conduct of a parent is not limited to conduct that has in fact detrimentally affected the children. Such conduct is of importance, perhaps decisive, "when it is reasonably predictable that the moral environment will adversely affect the child." *Ryan v. Ryan,* 652 S.W.2d 313, 315 (Mo.App.1983). Also see *In re Marriage of P.I.M.,* [665 S.W.2d 670, 672 (Mo. App.1984)]. There must be considered what conduct a parent may inspire by example, or what conduct of a child a parent may foster by condonation. Past and present conduct may be a reliable guide to the priorities of a parent.

*Id.*

In this case, there was undisputed evidence that Husband has an extensive history of criminal and untruthful behavior. In 1990, Husband was convicted of two counts of felony theft for breaking into cars and stealing car stereos. In 1991, Husband pled guilty to three felony counts and one misdemeanor count involving theft and mischief, and received five years' probation. Husband violated his probation in 1994 when he was charged with felony theft for stealing logs which he had cut down from another person's property. The charge was later reduced to a misdemeanor.

In 1995, Husband fraudulently obtained worker's compensation benefits in Montana, a felony. Husband had applied for worker's compensation benefits and then continued to cut firewood for pay while his worker's compensation case was pending. He testified that his actions were justified because he had to support himself. In December of 1995, after Husband and Wife had moved to Missouri, Husband was caught stealing prescrip-

tion drugs, specifically birth control pills, from his employer, the Audrain County Medical Center. Husband was not prosecuted for this offense, but he was fired. Husband testified that he stole the birth control pills for Wife, and that it was stealing "on paper, but in my feelings it was not."

In 1996, Husband applied for a job with the Fulton State Hospital, but was rejected after he lied on the employment application. The application asked if he had ever committed a felony. Husband testified that he was not sure what he wrote in response to the question. He thought he answered "yes," but when asked if he was sure he did not answer "no," he testified, "I'm not 100 percent sure, but I don't think I would." According to Husband, he did not lie on the application, he "just did not put down what they expected [him] to put down."

Husband's past criminal and dishonest conduct may be a reasonable predictor of the moral environment in which he will raise his son. Although he testified at trial that he makes regular visits to the probation and parole office, and that his legal problems taught him that he would "never do anything to break the law again," his attempts to justify his criminal and dishonest behavior indicate an inability to appreciate the wrongfulness of his actions. While not dispositive in itself, it is appropriate to consider the effect Husband's conduct may have on Tyler's moral development, including what type of conduct Husband will inspire or condone in Tyler. *J.L.S. v. D.K.S.*, 943 S.W.2d 766, 775 (Mo.App.1997).

Applying the factors listed in § 452.375.2, RSMo Cum.Supp.1997, to this case, and considering Husband's past criminal and dishonest conduct, this court is firmly convinced that the trial court's award is manifestly erroneous and contrary to Tyler's best interests and welfare. Accordingly, that portion of the trial court's judgment regarding primary physical custody of Tyler, visitation rights, and child support is reversed, and the cause is remanded for the trial court to enter an appropriate order transferring primary physical custody of Tyler to Wife. The trial court shall grant Husband appropriate visitation rights and set the amount of child support Husband shall pay. Because of this

ruling, this court need not address Wife's second and third points, which allege error in the trial court's child support award.

### The Trial Court Did Not Err in Failing to Restore Wife's Maiden Name

■ In Wife's fourth point, she alleges that the trial court erred in not restoring her maiden name of Lafferty to her. In his petition for dissolution of marriage, Husband requested that Wife's maiden name be restored to her, and stated that no one would be prejudiced by the restoration. In her counter-claim, Wife did not request that her maiden name be restored. At trial, the only evidence presented regarding restoration of Wife's maiden name was her testimony, in response to one question by her counsel, that she was asking the court to restore her maiden name of Brandy Lafferty to her. In its judgment of dissolution, the trial court did not address restoring Wife's maiden name.

Section 452.310.2, RSMo 1994, provides that "The petition in a proceeding for dissolution of marriage or legal separation shall be verified and shall allege the marriage is irretrievably broken and shall set forth: . . . (6) The relief sought." Wife's counter-claim sought custody of Tyler, child support, an equitable division of property, attorney's fees and maintenance, but not the restoration of her maiden name.

This court cannot charge the trial court with error in failing to restore Wife's maiden name. Husband's request in his petition to restore Wife's maiden name to her was ineffective to raise the issue, as the common law and statutory rights to change her name belonged to Wife, and not to Husband. *See Miller v. Miller*, 670 S.W.2d 591, 592 (Mo. App.1984); *Matter of Natale*, 527 S.W.2d 402, 405–06 (Mo.App.1975). Section 527.270, RSMo 1994, and Rule 95.01 provide only for the person desiring to change his or her name to petition the court to that effect. The limited exception to this rule is a petition to change the name of a minor child brought by the child's parent in a dissolution of marriage proceeding. *See Neal v. Neal*, 941 S.W.2d 501, 503 (Mo. banc 1997).

Wife did not ask to have her maiden name restored in her counter-claim and she did not ask the trial court for leave to amend her petition to include such a request. Nor was

the one question asked by Wife's counsel sufficient to advise the court that the matter was being tried by consent of the parties. *See Czapla v. Czapla,* 801 S.W.2d 785, 786–87 (Mo.App.1991); *Riley v. Riley,* 778 S.W.2d 666, 668 (Mo.App.1989). This court will not reverse the trial court's failure to restore Wife's maiden name. However, as this court is remanding the case for reconsideration of other matters and Wife has now made it clear that she does desire to have her maiden name restored, the trial court should allow Wife to amend her pleadings to include a request to restore her maiden name. The trial court should then consider Wife's request on remand.

Because this court finds that the trial court's award of primary physical was manifestly erroneous and against the best interests of the child, the physical custody award is reversed and remanded for the trial court to enter an order transferring primary physical custody of Tyler to Wife. Accordingly, the child support and visitation awards are also reversed and remanded. Additionally, the trial court is directed to allow Wife to amend her pleadings to include a request to restore her maiden name and consider the issue on remand.

All concur.