Sherri HANKINS, Respondent,

v.

James HANKINS, Appellant.

No. WD 50500.

Missouri Court of Appeals,
Western District.

April 23, 1996.

Marilyn M. Shapiro, Kansas City, for appellant.

Regina Keelan Bass, Thayer, Bernstein & Bass, Kansas City, for respondent.

Before HANNA, P.J., and SMART and ELLIS, JJ.

ELLIS, Judge.

James Hankins appeals from a judgment for dissolution of marriage entered by the Jackson County Circuit Court.

James and Sherri Hankins were married on February 14, 1988. They had one child, James Matthew Hankins (Matt), born October 15, 1990. The parties separated on June 1, 1992, and Sherri filed a petition for dissolution of their marriage on August 18, 1992. James filed an answer and cross-petition on September 23, 1992. On September 15, 1993, the trial court held a hearing on the matter, and at that time, the parties entered into a separation agreement. On November 5, 1993, the court entered a decree of dissolution incorporating the written settlement agreement. On November 18, 1993, James filed a motion to reconsider, set aside the judgment and for new trial based upon the inequity of the written agreement, newly discovered evidence, and his physical condition.[1] On November 30, 1993, the court sustained James' motion for new trial, based on, among other things, James' physical condition, the serious nature of the matters involved, and the circumstances surrounding the parties' negotiation the settlement agreement.[2]

---

1. James suffers from chronic seizures, cognitive difficulties, and memory impairment as a result of an aneurysm he had in 1990 and the four surgeries he required after his aneurysm. James has taken medication for the problem and his doctors have restricted certain activities because of the seizures, including driving a car, swimming, etc.

2. On the date of the hearing, September 15, 1993, after seven hours of negotiating, James requested a continuance based on his health.

The case was set for a new trial commencing March 24, 1994. After Sherri called one witness, the parties attempted further negotiations but James had another seizure. The hearing was continued, and the court conducted hearings on May 20, 1994, July 29, 1994, August 3, 1994, and August 5, 1994. After conclusion of the evidence, the court requested certain medical information regarding James and an accounting of the social security benefits he had received for himself and on behalf of Matt. Subsequently, counsel met with the court to discuss the medical issues and James provided social security form 2468.

On November 8, 1994, the court entered a judgment in which it awarded sole custody of the minor child to Sherri, awarded specified visitation, and placed certain restrictions on James' visitation based on concerns about his health, including requiring him to provide quarterly written reports from his physician regarding his health, supervision of all visitation, and prohibiting him from driving with Matt in the car. The decree also ordered James to pay current and retroactive child support; ordered James to reimburse Matt's social security benefits in the amount of $10,-348.00 at $100.00 per month into a college fund for the child; ordered Sherri to provide health insurance for Matt with the parties equally dividing uninsured medical bills; awarded the family residence to James; divided marital debt; divided the parties' marital property so that each would receive an equal share of the assets in value; and ordered James to pay $2,500.00 of Sherri's attorney's fees.

On December 5, 1994, Sherri filed a motion to correct, amend and modify the judgment, requesting that the court enter a provision relating to the parties' residence whereby James would refinance the property and requesting that the court require the parties to sign documents necessary to effectuate transfers of property, the necessity of a Qualified Domestic Relations Order (QDRO) to divide her retirement account, and a Qualified Medical Child Support Order (QMCSO) to require her to provide insurance. She also requested certain changes in the holiday visitation schedule. On December 7, 1994, the court entered a stay of judgment on its own motion. On December 8, 1994, James filed a motion to reconsider, set aside the judgment or for new trial, requesting the court to reconsider child custody, visitation, and division of property, specifically language relating to Sherri's 401(k) and attorney fees.

On December 21, 1994, the court entered its amended judgment entry, which was the same as the original entry except that it required that a QDRO be entered related to division of property and a QMCSO be entered relative to health insurance. It also contained provisions regarding the family residence which were not in accordance with the agreement testified to by the parties. In the amended decree, the court overruled James' motion to reconsider, set aside the judgment and motion for new trial, finding it had been filed out of time.[3]

On January 3, 1995, James filed his notice of appeal. On January 12, 1995, the court on its own motion set a hearing to reconsider the motions previously filed by the parties. After this hearing, the court entered a second amended judgment entry on January 19, 1995, correcting the provisions relating to the parties' real estate and requiring James to maintain Matt as an irrevocable beneficiary on only his Equitable Life Insurance Policy rather than on all policies, which the amended decree had required.

James raises eight points on appeal. As this is a court tried case, we will affirm the judgment of the trial court unless there is no substantial evidence to support it,

(He had had a seizure a few days earlier.) Because it appeared as though they were close to reaching an agreement, the court requested that the parties continue their negotiations for a short while, despite James' request for a continuance. The parties eventually reached an agreement that day, and James was never granted his request for continuance.

3. James contends it was filed within 30 days of the judgment entry. The judgment was entered November 8, 1994, and his motion was filed December 8, 1994, on the 30th day. However, in its second amended judgment entered January 18, 1995, the court found James had, in fact, timely filed his motion.

it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). "An appellate court should set aside a judgment on the ground that it is against the weight of the evidence only 'with caution and with a firm belief that the decree or judgment is wrong.'" *Harris v. Harris,* 803 S.W.2d 167, 169 (Mo.App. S.D.1991) (quoting *Jun v. Murphy,* 763 S.W.2d 290, 294 (Mo.App.1988)). In reviewing a contention that the evidence is insufficient, we view the evidence in the light most favorable to the verdict and we defer to the trial court's assessment of credibility. *Ugbaja v. Sumpter,* 821 S.W.2d 557, 559 (Mo.App. E.D.1991).

■ In his first point, James contends the trial court erred in awarding sole custody of Matt to Sherri rather than awarding joint legal custody to the parties and contends the court's ruling was against the weight of the evidence, not supported by substantial evidence, and was an abuse of discretion. The basis for determining child custody is the best interest and welfare of the child. § 452.375.2;[4] *Chapman v. Chapman,* 871 S.W.2d 123, 125 (Mo.App. E.D.1994); *Nix v. Nix,* 862 S.W.2d 948, 950 (Mo.App. S.D.1993). As James points out, the General Assembly specifically declared in § 452.375.3 that it is the public policy of this state to assure children frequent and meaningful contact with both parents and that it is in the public interest to encourage parents to share decision-making rights and responsibilities of child rearing. *See Luther v. Vogel,* 863 S.W.2d 902, 904 (Mo.App. E.D.1993). In order to effectuate this policy, the court is to determine the custody arrangement which will best assure the parents share decision-making as is in the best interest of the child under all relevant circumstances. § 452.375.3. Also, under § 452.375.4, the court is to first consider joint custody to both parents, and joint custody should not be denied solely for

the reason that one parent opposes a joint custody award.[5]

■ James alleges the trial court failed to adequately consider these policies and directives in making its decision to award sole custody to Sherri.

The preference for joint custody as stated in section 452.375 "'is not that of a forced joint custody in order to induce the parents to find a common ground.'... Rather, it is a preference 'in favor of parents who show the willingness and ability to share the rights and responsibilities of childrearing even after they have dissolved the marriage.'" *In re Marriage of Johnson,* 865 S.W.2d [412, 417 (Mo.App.1993)] (quoting *Margolin v. Margolin,* 796 S.W.2d 38, 49 (Mo.App.1990)).

*Burkhart v. Burkhart,* 876 S.W.2d 675, 680 (Mo.App. W.D.1994). "Where the record is devoid of substantial evidence that the parties have a commonality of belief concerning parental decisions and the willingness and ability to function as a unit in making those decisions, it is error for the trial court to award joint legal custody." *Id.*

The record in the case at bar contains substantial evidence that the parties have had difficulty agreeing on certain decisions regarding the child, including naps, diet, medical treatment, and preschool. The evidence also shows that James had not communicated with Sherri as to issues regarding his health and seizures. The trial court specifically relied on these factors in its judgment.[6] James concedes the parties have had some difficulties with communication and decision-making regarding the child but that the problems were solvable and did not support an award of sole custody. However, James' contention that he thought the parties could, in the future, solve their problems regarding communication and decision-making is not enough to overcome the evidence supporting

---

4. All statutory references are to RSMo 1994.

5. Sherri requested she be awarded sole custody, whereas James requested that the parties be awarded joint legal custody with Sherri being designated as Matt's primary physical custodian.

6. The trial court specifically found James "testified that he withheld information from [Sherri] because he didn't want to argue with her." It also found James "has demonstrated a marked unwillingness to communicate with [Sherri] in important matters relating to the safety and other needs of the minor child" and lists specific instances of this.

the trial court's decision awarding sole custody.[7]

■ "We are entitled to presume the trial court considered all the evidence and awarded custody in the best interest of the child." *Chapman,* 871 S.W.2d at 125. Furthermore, there is no presumption in favor of joint custody; rather, it is only an option. *Id.* James' allegations that the court did not consider Matt's best interest and that the court awarded sole custody to Sherri as a result of Sherri's request for sole custody or as a punishment toward James are not supported by the record. An award of child custody should not be disturbed unless the trial court's ruling is clearly against the logic of the circumstances or is arbitrary or unreasonable and the appellate court is firmly convinced that the welfare of the child requires some other disposition. *Burkhart,* 876 S.W.2d at 678. "Accordingly, in child custody proceedings the determination of the trial court is given greater deference than in any other type of case." *Id.* We find the record supports the finding that it was in Matt's best interest to award sole custody to Sherri. James' first point is denied.

■ In his second point, James contends the trial court's award of visitation and the restrictions it placed on the visitation were against the weight of the evidence, not supported by the evidence, and an abuse of discretion. In the amended decree, the court ordered visitation every other weekend from 5:00 p.m. Friday to 5:00 p.m. Sunday; evening visitation every Wednesday from 5:00 p.m. to 8:00 p.m. (except on weeks where a delineated holiday occurs or when Matt is vacationing with Sherri); alternating major holidays from 9:00 a.m. to 5:00 p.m., specifically listing the major holidays and Matt's birthday; James to have visitation every Father's Day and his birthday from 9:00 a.m. to 5:00 p.m., and Sherri to have Matt on Mother's Day and her birthday; visitation for two weeks during summer vacation to be taken in one-week intervals until Matt reaches age 10 at which point James will be entitled to three weeks of summer vacation to be taken in one two-week interval and one one-week interval. The court also ordered, "as a precondition to his visitation," that James provide Sherri with quarterly written reports from his neurologist regarding his medical condition. It also ordered that all visitation be supervised by the paternal grandparents, the paternal uncle or another responsible adult agreed upon by both parties, and that James not operate a motor vehicle during visitation with the child unless his neurologist certifies in writing that it is safe for him to do so. James asserts error both in the visitation schedule and the restrictions placed on visitation.

As to the visitation schedule, James argues the court should have made the Wednesday visitation overnight rather than from 5:00 p.m. to 8:00 p.m. because of the time it will take to transport the child to and from James' house. He also contends the holiday visitation should be extended so that Labor Day, Memorial Day and Easter include a weekend in the visit because they fall on Monday or Sunday. He also claims that Christmas Eve and Christmas Day should be considered a single holiday and that he should have been given more summer visitation, increasing by a week each year up to six weeks.

■ As with custody, the principal factor to be considered in an award of visitation is the best interest of the child. *In re Marriage of Amos,* 843 S.W.2d 946, 950 (Mo. App. S.D.1992). And again, we are entitled to presume the trial court considered all the evidence and made its award in the best interest of the child. *Chapman,* 871 S.W.2d at 125. We will reverse a visitation order only where the visitation ordered is of unreasonable frequency or duration. *In re Mar-*

---

7. James relies on *Luther v. Vogel* because the court in that case found that although there had been acrimony between the parents in the past and probably will be acrimony in the future, there was substantial evidence in the record that they had the ability to deal with each other concerning the rearing of their child. 863 S.W.2d at 904. However, *Luther* is distinguishable in that the court deferred to the trial court's discretion and affirmed its finding that joint legal custody was in the child's best interest under the facts of that case. In contrast, here we must defer to the trial court's discretion to affirm its finding that the parties could not cooperate and that it was in Matt's best interest to not award joint custody.

*riage of Powers*, 527 S.W.2d 949, 953 (Mo. App.1975). Each child custody case must be decided on its facts and it is difficult to compare different awards made by the trial courts. *Id.* The visitation schedule awarded in the case at bar is not atypical. The fact that James is unhappy with the schedule, or that parts of it are not the most convenient option, or that certain aspects of it are not identical to what the parties agreed to does not mean the award is not in Matt's best interest. *See Massman v. Massman,* 749 S.W.2d 717, 719 (Mo.App. E.D.1988). We cannot say under the circumstances of this case that the visitation awarded was unsupported by the evidence or unreasonable in its frequency or duration, or that Matt's welfare requires some other disposition.

■ Regarding the restrictions placed on the visitation, the trial court's order states:

Respondent has demonstrated a marked unwillingness to communicate with Petitioner in important matters relating to the safety and other needs of the minor child including: his failure to keep Petitioner informed on a month by month basis of his current medical treatment and the occurrence of his seizures whether the child is present or not, his physician's medical opinion regarding his ability or inability to drive a motor vehicle, his physician's medical opinion regarding his ability or inability to meet the day to day needs of the child alone and without additional adult supervision, and his repeated refusal to provide the Petitioner with an accounting of the child's social security benefits when Respondent served as sole representative payee from October, 1991, through November 1993. Respondent's unwillingness and/or inability to communicate with Petitioner in matters regarding his health, his son's safety and his son's benefits are not in the best interests of the child. Reasonable unsupervised visitation would endanger the child's physical health and impair his emotional development, pursuant to R.S.Mo 452.400.[8]

James contends the trial court made its order based not on Matt's best interest, but on his inability to communicate with Sherri and he implies the court is discriminating against him because he is disabled. However, there is no dispute that James suffers from the complications of an aneurysm he had in 1990, which include seizures, problems with concentration, and problems with reading and learning new things. His condition clearly has an impact on his ability to care for a small child. The court specifically found that James "provided no credible evidence that would indicate that he would be able to care for the child alone or to drive with the child in the car. As recently as October, 1994, his seizure disorder medication has been readjusted." This finding was supported by the evidence.

■ We find it was reasonable for the court to be concerned about placing Matt, who was four years old at the time, in James' care without requiring some form of safeguard to protect Matt in the event James had a seizure or other medical problem in Matt's presence. There is no evidence to support the allegation that the court considered anything other than Matt's safety when it made its order. James cites evidence that his seizures are under control at this point. But the evidence on that issue is disputed, and where there is contradictory evidence, we defer to the trial court's credibility determinations. *Burkhart,* 876 S.W.2d at 678. James can request a modification at a later time if he can demonstrate his condition has changed substantially requiring a modification. *See TMK v. JWK,* 667 S.W.2d 733, 735 (Mo.App. E.D.1984) (holding that restrictions on a father's visitation could be changed later if circumstances changed). James' second point is denied.

■ In his third point, James contends the trial court erred in its calculation of retroactive child support and the method of payment of that support. In its decree, the court ordered James to pay a total of $10,-

---

8. Section 452.400.1 provides, in pertinent part: "A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development."

567.45 as retroactive child support.[9] As James concedes, the court may order a parent to pay child support retroactive to the date of the filing of the petition. § 452.340. James also concedes he received social security payments for the benefit of Matt from June, 1992, through December, 1993, but maintains the funds were deposited into a checking account from which the mortgage payments for the family residence were made. The mortgage payments he made while he was receiving Matt's social security funds exceeded Matt's benefit payments and James continued to make the mortgage payments after the social security benefits were paid directly to Sherri. He contends his mortgage payments were for Matt's benefit because they allowed him to stay in the family home with Sherri and maintain his standard of living, and therefore should have been considered by the court to be a "self-imposed temporary order of support." He claims that because the parties agreed there was no equity in the property and that he did not receive any tax benefit, the payments were solely for Matt and Sherri's benefit and should therefore be considered by the court in its order. However, the court could find James received a benefit from making the mortgage payments. In fact, James testified he made the mortgage payments "because he didn't want to screw up his credit."

The cases James cites, *Sprague–Cappel v. Sprague*, 852 S.W.2d 361, 364 (Mo.App.1993), and *Tzinberg v. Tzinberg*, 631 S.W.2d 681, 682 (Mo.App.1982), merely stand for the proposition that mortgage payments *may be* considered temporary maintenance. As he points out, the question as to whether to credit payments not made expressly as child support rests upon equitable considerations to avoid injustice. *Poppe v. Poppe*, 866 S.W.2d 186, 188 (Mo.App. W.D.1993). As such, it was within the trial court's discretion to decline to credit James with those mortgage payments as retroactive child support.

We will not reverse the decision because the evidence supported the conclusion that James received a benefit from the mortgage payments he made.

James also contends the court failed to consider his ability to pay in setting his monthly payments for retroactive child support. In the decree, the court ordered James to pay monthly child support in the amount of $502.35.[10] It gave him a credit of $258.00 for the social security paid, leaving James with a monthly payment of $244.35 per month. The court then ordered him to pay $200.00 per month toward the $7,797.00 judgment (the retroactive child support from September, 1992, through November, 1993) and a separate $200.00 per month toward the $2,670.45 judgment (for retroactive child support from December, 1993, through October, 1994), for a total payment toward retroactive child support of $400.00 per month. The court also ordered James to repay Matt for the $10,348.00 social security payments made to James for Matt's benefit before the separation (which James used to pay the mortgage), at $100.00 per month. The court ordered the total amount of current child support, retroactive child support, and repayment of debt, totalling $744.35 per month, assigned from his wages.

James contends that after the $744.35 is taken from his monthly income of $2,185.20 (including disability and social security payments), he does not have enough left to pay his mortgage, medical bills, and other reasonable bills. James is correct that under § 452.340, the court is to consider the parent's ability to pay when making an award of child support. However, ability to pay is only one of several factors to be considered under § 452.340. Even so, there is no evidence the court did not consider James' ability to pay. The evidence was disputed as to what James' actual expenses were, including,

9. The retroactive child support was calculated as follows:
   $7,797.00 — Social security benefits received by James for the benefit of Matt while Matt was in Sherri's custody from September, 1992 through November, 1993.
   960.00 — Retroactive child support from December, 1993 through March, 1994.

1,710.45 — Retroactive child support from April, 1994 through October, 1994.

10. Although James does not contest the current child support award, we note that the court did make its calculations based on its own Form 14 calculations.

among other things, his payment of rent (he was living with his parents) and his car payment (there were allegations that James' father was making the car payments). There was also evidence James had $15,800 in a bank account, had recently invested over $3,500.00 in another account, and had loaned his sister $3,500.00 while the parties were separated.

Credibility determinations are for the trial court, *Burkhart,* 876 S.W.2d at 678, and the trial court resolves conflicts in the evidence and can draw all reasonable inferences from the evidence presented to it. *Porath v. McVey,* 884 S.W.2d 692, 693 (Mo. App. S.D.1994). We will not disturb a child support award or substitute our judgment for the trial court's unless the evidence is palpably insufficient to support it. *Holmes v. Holmes,* 878 S.W.2d 906, 909 (Mo.App. E.D. 1994). We find the record supports the award of retroactive child support. James' third point is denied.

Fourth, James contends the trial court erred in ordering him to repay the $10,348.00 social security benefits he received on behalf of his son, Matt, from October 1991, through August 1992, and ordering Sherri to open a savings account for the deposit of James' payments (of $100.00 per month) to be saved for Matt's future college expenses. Prior to the separation, when James was receiving Matt's social security payments, James had deposited Matt's social security funds into an account, along with his own social security benefits, and paid the mortgage on the family residence and other expenses out of that account. The court specifically found that James had thereby spent Matt's social security funds for his own indebtedness and personal expenditures and not for the benefit of Matt and ordered that he repay it to Matt.

James does not dispute that prior to the separation, he and Sherri had agreed that Matt's social security benefits would be saved for Matt's education, but asserts that after the separation, because their financial condition changed, the funds were necessary to meet current obligations and could not be saved for Matt's education. Again, he points to the fact that the funds were used to pay the mortgage on the house where Matt was living with Sherri, and so the funds were used for Matt's necessary benefit. And again, he contends the court failed to consider his ability to pay, asserting this order is, in effect, an additional award of support.

As we have already said, it was within the trial court's discretion to find that the mortgage payments were not made for Matt's benefit but for James' benefit. Furthermore, according to the statement of property James filed with the court in 1992, James had $12,000.00 in an account which was earmarked for Matt's education. Although James concedes that he signed and submitted this information to the court, he contends he did not understand the contents of the document he signed. Again, credibility determinations are for the trial court and the record contains evidence to support the court's finding that the mortgage payments were not made for Matt's benefit.

In his fifth point, James contends the trial court erred in its order that he provide life insurance for the benefit of Matt because it constitutes a posthumous order of support. Under Missouri law, a parent is not required to support a child after death, and life insurance is considered to be posthumous support. *Wynn v. Wynn,* 738 S.W.2d 915, 920 (Mo.App. E.D.1987). Further, if a life insurance provision is designed to provide support for a child after death, it is void. *Rogers v. Rogers,* 803 S.W.2d 92, 97 (Mo.App. E.D.1990). Sherri concedes that the order requiring James to maintain life insurance for the benefit of Matt and to designate Matt as an irrevocable beneficiary on his life insurance policies was error. We therefore must reverse on this point, with directions that the trial court remove the requirements regarding life insurance from its decree.

In his sixth point, James contends the trial court erred in its division of property in that the court failed to take his separate property into consideration and incorrectly valued an item of his separate property. In its decree, the court found that the parties owned a total of $29,546.00 in marital property. It equally divided that amount, and awarded $14,773.00 in assets to each party.

The court included as marital property a $3,500.00 loan James had made to his sister, and awarded that to him. James maintains that this loan came from an account at Commerce Bank which was his separate property, and thus, it should not have been included in the marital estate. Rather, it should have been awarded to him as separate property.

The party who claims an item of property is non-marital has the burden of proving it is non-marital. *Sprock v. Sprock,* 882 S.W.2d 183, 185 (Mo.App. W.D.1994). Although James maintained the loan came from his separate Commerce Bank account, the evidence was not conclusive on that point. James had more than one account at Commerce Bank, including the one into which his and Matt's social security funds were deposited, and he testified at trial that the loan came from "one of his Commerce accounts." The record is not clear whether the loan came from his separate account or one of his other Commerce accounts. As such, James did not meet his burden of proving the loan was non-marital, and the trial court was free to determine it was not.

James also contends the trial court erred in valuing the non-marital portion of his 401(k) which he had through his employer when the parties were married. The court found that the non-marital portion of the 401(k) was $2,000.00. James contends he had $2,300.00 in the 401(k) when he got married and estimates that that amount earned $400.00 in interest during the marriage, totalling $2,700.00 in non-marital property. Thus, he contends the marital estate should be reduced by an additional $700.00. Again, James bore the burden of proving what amount of the 401(k) was non-marital property, *Sprock,* 882 S.W.2d at 185, and the evidence was not conclusive as to how much of the account was non-marital. James' sixth point is denied.

In his seventh point, James asserts the trial court erred in ordering him to pay a part of Sherri's attorney's fees. In its decree, the court ordered James to pay $2,500 of Sherri's nearly $12,000.00 attorneys fees. Under § 452.355.1, the court may order reasonable attorney fees "after considering all relevant factors including the financial resources of both parties." James alleges the award was against the weight of the evidence, was not supported by the evidence, and was an abuse of discretion because the court did not adequately consider the relative financial situations of the parties and inappropriately considered James' filing the motion for new trial after the first decree. To the contrary, the evidence regarding the parties' relative financial situation, as discussed, *supra,* supports a finding that James was able to pay $2,500.00 in Sherri's attorney fees. Additionally, the court's order does not justify the award on the basis of James' filing his motion for new trial. Rather, it states that "[t]he parties settled this matter in September, 1993, but the settlement offer was withdrawn by Respondent. Petitioner is seeking reimbursement for any attorneys fees incurred by her since the aborted settlement." It then ordered "that Respondent shall pay to Petitioner $2,500.00, as and for a portion of her attorney's fees incurred in this cause." The court ordered each party pay the rest of their own attorney fees and ordered Sherri to pay the costs of the action. We find the trial court was within its discretion in ordering James to pay part of Sherri's attorney fees, and the award was supported by the evidence. *See Luther,* 863 S.W.2d at 905.

Finally, James argues the trial court erred in its entry of the second amended judgment on January 19, 1995, because under Rules 75.01 and 81.05, the court had no jurisdiction to enter such a judgment except to make ministerial changes to its previous orders.[11] Sherri concedes that the trial court had no jurisdiction to enter an award, other than to make ministerial changes, after December 21, 1994, when the court ruled on the motions for new trial. She concedes that any

---

11. Rule 75.01 allows the trial court to correct, vacate, amend or modify a judgment within 30 days after entry of the judgment. Rule 81.05 provides that in the event a motion for new trial is timely made, the judgment becomes final 90 days after the filing of the motion if no ruling is made on it, or if the motion is ruled on, then the later of the thirty days or the date of disposition of the motion.

provision as to life insurance (in either the amended judgment or the second amended judgment) is void. She contends, however, that the order contained in the second amended judgment regarding the disposition of the marital residence was ministerial and therefore valid.

The change to which Sherri refers corrects two clerical errors by deleting a provision that James obtain refinancing *within thirty days from the entry of the amended judgment* and that in the event he was unable to refinance within that time, that the property be placed on the market with the proceeds to be split equally between the parties. At the hearing on January 17, 1995, both parties agreed that these corrections should be made because they were mistakenly included in the prior judgment. The changes were clearly ministerial in nature and thus had the effect of an order *nunc pro tunc.* However all other provisions in the second amended judgment which effected changes in the prior judgment are substantive and therefore beyond the court's jurisdiction. Thus, they are void.

We therefore declare the second amended judgment entered on January 19, 1995, void except for the provisions relating to the disposition of the marital residence as discussed, *supra.* We reverse the amended judgment of the trial court, entered December 21, 1994, as to the provision relating to life insurance, on which we remand with orders to the trial court to remove any requirement that the parties maintain life insurance naming Matt as a beneficiary. The judgment is affirmed in all other respects.

All concur.