Katherine O'CONNOR (Formerly Miroslaw), Appellant,

v.

Michael S. MIROSLAW, Respondent.

No. WD 74673.

Missouri Court of Appeals, Western District.

Nov. 20, 2012.

**544**

Anita I. Rodarte, Kansas City, MO, for Appellant.

Thomas B. Manson, for Respondent.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

VICTOR C. HOWARD, Judge.

Katherine O'Connor appeals the judgment of the trial court entering a dissolution decree. In several points on appeal, she challenges the court's determinations regarding child custody and property division issues. The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded to the trial court with directions.

## FACTS

Katherine O'Connor (hereinafter "Wife" or "Mother") and Michael S. Miroslaw (hereinafter "Husband" or "Father") were married on May 11, 2002. The parties separated on February 1, 2010. Prior to the marriage, Husband accumulated substantial assets through successful business ventures. He estimated that at the time of the marriage, his net worth was approximately $4.6 million. He was not employed at that time, but had significant income from his investments which made his employment unnecessary. When the parties planned to marry, Wife was employed with two young children from a previous marriage, Tommy, born May 1998, and Sophie, born August 1999. Husband and Wife agreed that when they married, Wife would quit working and remain home to be a full-time mother to Tommy and Sophie, and Husband and Wife would start a family of their own. The parties also agreed that Husband's assets and income were sufficient to support Wife, Tommy, Sophie, and the family they planned to start together.

### *Premarital Agreement*

On May 7, 2002, the parties signed a premarital agreement that contained a choice of law provision stating it was governed by Kansas law. The agreement also provided that compensation, defined within the agreement, earned during the mar-

riage should be deposited into a joint account, and any expenditure made from the account was to be made with both parties' consent. If a party made an expenditure without the other's consent, the non-consenting party had 60 days to object once he or she knew or had reason to know an expenditure was made, or any objection was waived. In the event of divorce, the compensation account was to be equally split between the parties. Both parties acknowledge that the compensation account was never created, but all compensation earned by Husband was deposited into a First State Bank (hereinafter "FSB") account titled in Husband's individual name, which existed before the marriage and had been set aside in the agreement as his individual property.

The agreement further provided for division of the parties' property in the event of a divorce. Specifically, the agreement defined what was Husband's individual property, including a residence in Fairway, Kansas (hereinafter "Fairway"), and what Wife's share of Husband's individual property would be upon divorce.

### Marriage

Upon the marriage of the parties, Wife, Tommy, and Sophie moved into Fairway with Husband. Wife quit employment and was not employed again throughout the remainder of the marriage. Shortly after the marriage, the parties opened an account with Bank of America (hereinafter "BoA") titled in their joint names. The marriage produced three children, Maxwell, born April 2003, Peter, born October 2005, and Helen, born January 2007.

In February 2003, Husband began working for Store Financial (hereinafter "Store"), a business in which he held an approximate ten percent equity interest. He continued to work for Store through the date the Judgment for Dissolution of Marriage (hereinafter "Judgment") was entered. Husband's compensation from Store in 2003 and 2004 was deferred, and he began receiving compensation from Store in 2005. The deferred compensation from 2003 and 2004 was paid to Husband in 2006. All compensation was deposited into Husband's FSB account.

On July 17, 2006, the parties purchased a home on Westover Road, Kansas City, Missouri (hereinafter "Westover"), which was jointly titled to them. The purchase price of Westover was $1,135,000, for which the parties paid $544,929, and took out a $600,000 mortgage. Husband paid the mortgage on Westover from his FSB account.

On August 10, 2006, Fairway was sold, and the proceeds of approximately $335,000 were deposited into the FSB account. On October 16, 2006, the mortgage on Westover was refinanced, toward which Husband testified that he contributed an additional $284,122 from the FSB account, alleging the funds were from the Fairway sale. The trial court found Husband had sufficiently traced $799,051.04 of the funds used to purchase and refinance Westover as his individual property.

Throughout the marriage, Husband deposited both income from his premarital assets and his compensation in the FSB account. Each month, Husband would write a check to Wife to cover household expenses, which Wife deposited into the BoA account and used to pay family and household expenses. If additional funds were needed, Husband provided them to Wife upon request. Additionally, during the marriage the parties took expensive vacations, remodeled their home, and paid for all the children's private school education. Wife made no objections to any of these expenditures. Marital household expenses exceeded the compensation earned during the marriage.

### *Separation and Dissolution*

The parties separated in February 2010, and Wife filed her First Amended Petition for Dissolution of Marriage on April 30, 2010. When Wife expressed her intent to separate, the parties purchased a jointly titled residence on Baltimore Road, in Kansas City, Missouri (hereinafter "Baltimore"). Husband contributed $198,650.01 at closing on the home, traced to Husband's Schwab account, which was his individual property under the premarital agreement.

The Petition for Dissolution of Marriage was tried over the course of several days. Neither party challenged the validity of the premarital agreement, and each requested that it be enforced. Evidence at trial showed that the parties' children of preschool or school age had all always attended St. Elizabeth's for preschool, and Visitation for school. As a result the children had been with the same friends and peer groups for nearly all their lives. There was evidence Max loved school, his friends and his community. The children were thriving in their community and school environment.

The trial court appointed Maureen Patton, a licensed marriage and family therapist and clinical social worker, to complete a custody assessment and evaluation. She described the children as well-behaved and bright. Wife testified that Max was very good in school and conscientious regarding his schoolwork. She also testified that she believed Visitation was an academically strong school. Based on the evidence adduced, the trial court ordered that the children shall attend Visitation School.

Regarding parenting, Ms. Patton did not make a specific parenting time recommendation to the court. She stated she believed Husband had some excellent parenting skills and that Wife described him as a good father, which Wife confirmed on cross-examination. Ms. Patton testified that it is important for both parents to have significant amounts of time with the children, otherwise the children would miss them. Ms. Patton's overall impression was that the children were doing generally well, and she was impressed with how well the children had done under the circumstances. She noted the children were attached to their parents and the parents were bonded with the children, which was one reason significant time with each parent was vital.

The trial court awarded the parties joint legal and joint physical custody of the children with Wife's residence designated as the address of the children for mail and educational purposes. The trial court adopted its own parenting plan, rather than that proposed by Husband or Wife. The plan gave Husband parenting time with the children every other weekend beginning at 3:00 p.m. on Thursday, or upon release from school, whichever is earlier, and continuing until Sunday evening at 7:00 p.m. Wife was awarded every other weekend, alternating with Husband's weekends, beginning at 3:00 p.m. on Friday, or upon release from school, whichever is earlier, and continuing until Sunday evening at 7:00 p.m. During the week before Wife's parenting weekend, Husband was awarded parenting time on Wednesday, beginning at 3:00 p.m., or upon release from school, whichever is earlier, and continuing until Friday at 8:00 a.m. or the beginning of school if school is in session. During the week after Wife's parenting weekend, Husband was awarded parenting time on Monday, beginning at 3:00 p.m., or upon release from school, whichever is earlier, and continuing until Tuesday at 8:00 a.m. or the beginning of school if school is in session. Each parent was also awarded two non-consecutive seven day vacation pe-

riods with the children, and alternating birthdays and holidays.

As to the division of property, each party presented evidence as to the amount of compensation acquired during the marriage, which, according to the premarital agreement, was to be deposited into a jointly titled account and equally divided upon dissolution of marriage. Rather than determining the amount of compensation acquired during the marriage, the trial court found that all compensation was placed in Husband's FSB account, leading the trial court to conclude that the account became the compensation account contemplated in the premarital agreement. The account also contained individual property of Husband, but his placement of compensation in the account, thereby commingling his individual and marital property, was found by the trial court to reveal his intent that the account become marital property. The trial court further concluded that the result of such commingling and transmutation removed the FSB account from the purview of the premarital agreement. The trial court thus treated the FSB account as marital property and divided the balance remaining in the account at the time of trial fairly and equitably in accordance with Missouri law, resulting in each party being awarded half the remaining balance of the account.

Notwithstanding the trial court's finding that the FSB account was marital property, it found that funds which passed through the FSB account for the purchase of Westover and Baltimore would be awarded to Husband as his individual property free of the ten percent payment to Wife otherwise applicable to Husband's separate property as dictated by the premarital agreement.

Wife was dissatisfied with the judgment entered by the trial court and filed a Petitioner's Motion to Reconsider, Reopen and Amend Judgment and Decree of Dissolution of Marriage on October 11, 2011. The trial court entered an Amended Judgment and Decree of Dissolution of Marriage on November 17, 2011. This appeal by Wife followed.

## STANDARD OF REVIEW

In a bench-tried case, the judgment of the trial court will be affirmed on appeal unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Owsley v. Brittain*, 186 S.W.3d 810, 814 (Mo.App. W.D.2006). The appellate court views the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's judgment and disregards all contrary evidence. *Id.* The appellate court also defers to the trial court's credibility determinations. *Id.*

## ANALYSIS

### *Custodial Issues*

 A trial court is afforded greater discretion in determining child custody than in other matters. *Krepps v. Krepps*, 234 S.W.3d 605, 611 (Mo.App. W.D.2007). An appellate court presumes that the trial court's custody award is in the child's best interests. *Id.* "Because the trial court is in a superior position to judge the credibility and sincerity of the witnesses, [the appellate court] 'may not substitute its judgment for that of the trial court so long as there is credible evidence upon which the trial court can formulate its beliefs.'" *Id.* (quoting *In re Marriage of Patroske*, 888 S.W.2d 374, 384 (Mo.App. S.D.1994)). A child custody award will not be disturbed on appeal unless the appellate court is firmly convinced that the child's welfare requires some other disposition. *Id.*

In her first point on appeal, Wife argues that the trial court erred in entering its parenting plan, which left custodial time unassigned, because sections 452.375.9[1] and 452.310 require that the parenting plan assign all custodial times and include the arrangements specified in section 452.310.7. Husband agrees with Wife's argument, acknowledging that the trial court's oversight in this respect is grounds for remand, but requesting that this Court instead add to the parenting plan the statement suggested by Wife: "the children shall be in Mother's custody at all times not specifically assigned to Father."

Section 452.310.7 explains that proposed parenting plans must

set forth the arrangements that the party believes to be in the best interest of the minor children and shall include but not be limited to:

(1) A specific written schedule detailing the custody, visitation and residential time for each child with each party[.]

The trial court's judgment does not specifically state that the children would be in Wife's custody at all other times not specified as Husband's parenting time. As a result, the judgment's parenting plan leaves unassigned custody from 7:00 p.m. on the Sunday of Wife's parenting weekend until 3:00 p.m. Monday, from 8:00 a.m. on the Tuesday following Mother's weekend until 3:00 p.m. Thursday, and from 7:00 p.m. on the Sunday of Husband's parenting weekend until 3:00 p.m. Wednesday.

 In order to prevent repeated disputes regarding custody and visitation, "the trial court must adopt a complete and comprehensive parenting plan." *In re Marriage of Goodman*, 267 S.W.3d 783, 789 (Mo.App. S.D.2008) (quoting *Simon–Harris v. Harris*, 138 S.W.3d 170, 181

(Mo.App. W.D.2004)). "If the parenting plan does not include the terms mandated by Section 452.375.9, remand is required so that the trial court may prepare a complete parenting plan consistent with the statutory requirements." *Id.* (internal quotations omitted).

Here, because the trial court failed to order custody to one of the parties for the abovementioned periods of time, remand is required so the trial court may prepare a complete parenting plan. The parties agree that the intent of the trial court was to assign the unassigned custodial time to Wife. The record appears to reflect that the trial court's failure to account for all custodial time was merely an oversight, and that the intent was that during the unassigned times Wife would have custody of the children. Accordingly, the case is remanded for the trial court to enter a judgment to include the following language in the parenting plan: "The children shall be in Mother's custody at all times not specifically assigned to Father."

Wife's first point on appeal is granted.

Mother's second point on appeal argues that the trial court erred in ordering that the children attend Visitation School because it had no authority to order the children to attend a specific private school in the absence of a parental agreement or evidence that the school meets a particular need of a child. Husband responds, arguing that because the trial court had jurisdiction over the children, it could make that decision, and that ordering the children to attend Visitation was supported by substantial evidence that it was in their best interests. Husband also argues that the parties could not agree on the children's education because Wife had requested the court's permission to relocate with the children, further supporting the

---

1. All statutory references herein are to RSMo Cum. Supp 2011 unless otherwise noted.

trial court's authority to enter an order regarding where the children must be educated.

■ Section 452.405.1 provides:

Except as otherwise ordered by the court or agreed by the parties in writing at the time of the custody decree, the legal custodian may determine the child's upbringing, including his education, health care, and religious training, unless the court after hearing finds, upon motion by the parent without legal custody, that in the absence of a specific limitation of the legal custodian's authority the child's physical health would be endangered or his emotional development impaired.

Moreover, "Missouri courts tend to defer to the judgment of the custodial parent 'with respect to decisions concerning education beyond that provided by the state system.'" *Leslie v. Leslie,* 948 S.W.2d 458, 462 (Mo.App. W.D.1997) (quoting *Leahy v. Leahy,* 858 S.W.2d 221, 226 (Mo. banc 1993)). On the other hand, where parents who are joint legal custodians under a decree of dissolution apparently are unable to agree on the proper school for the children, "it is within the trial court's discretion to participate in school selection in order to protect the best interests of the child." *In re Marriage of Manning,* 871 S.W.2d 108, 111 (Mo.App. S.D.1994).

■ Here, there is evidence that Husband and Wife were unable to agree on the proper school for the children, the primary basis of such disagreement being Wife's desire to relocate. This Court "may not substitute its judgment for that of the trial court so long as there is credible evidence upon which the trial court can formulate its beliefs." *Krepps,* 234 S.W.3d at 611. Thus, because the parties are apparently unable to agree on the proper school for the children, it was within the trial court's discretion to participate in school selection

in order to protect the best interests of the child. Because we are not firmly convinced that the children's welfare requires some other disposition, the trial court's order regarding the education of the children is affirmed. Wife's second point on appeal is denied.

In her third point on appeal, Wife argues that the trial court erred in rejecting her parenting plan and adopting its own, which allegedly failed to accommodate residential time with the children's half siblings and to provide regularity during the children's school week, because such failures result in the plan being contrary to the children's best interests to spend as much time with their half siblings as possible and to have a routine, uninterrupted school week.

Husband counters, arguing that the court's parenting plan did not fail to accommodate residential time with the children's half siblings or to provide regularity during the children's school week, and that the plan maximizes time with the children's half siblings while recognizing that time with both parents is more important and is not disruptive during the school week. Husband asserts the trial court's parenting plan was supported by substantial evidence and was in the best interests of the children.

The trial court expressly states in its judgment that it considered "that the children have close interactions and relationships with [Wife's] two children from a different relationship" in its custody determination, among the other relevant factors in determining the children's best interests, including each of those enumerated in section 452.375.2. The court further stated that the parenting plan it adopted provides for the best interests of the children. In accordance with Missouri public policy that it is in the children's best interest to

have frequent, continuing, and meaningful contact with each parent, the parenting plan adopted by the trial court provided each party with approximately fifty percent of the available parenting time.

■ As pointed out by Husband, Wife's arguments fail to comport with this Court's standard of review, which does not ask whether there was evidence to support the parenting plans the trial court chose not to adopt, but rather, whether the plan it chose to adopt was supported by substantial evidence. *Owsley*, 186 S.W.3d at 814. Here, substantial evidence, as well as established Missouri public policy, support a plan allowing the parties approximately equal time with the children. The evidence at trial also showed that Husband loved the children's half siblings as his own, that Husband was supportive of arrangements allowing the children to spend time together with their half siblings when they came back from parenting time with their biological father, that Husband treated the half siblings like his own children, that Husband had not had conflict with Wife in exchanging the children in the year between their separation and the trial, and that Husband's proposed parenting plan only included one night a week that the children and their half siblings would not be together. Such evidence supports an inference that Husband will continue to be supportive of the children spending time with their half siblings when possible and to be cooperative with Wife's requests to arrange for the same.

The evidence also revealed that the children were doing generally well, despite the change to their schedule caused by their parents' separation. In fact, testimony from Maureen Patton, therapist and social worker, showed that the children were doing impressively well under the circumstances. She noted that the children were attached and bonded to each parent, and

that made it important for each to have significant time with the children.

This Court has approved the separation of half-siblings where that custody arrangement is in the subject child's best interest. *Miers v. Miers*, 53 S.W.3d 592, 598 (Mo.App. W.D.2001); *Couch v. Couch*, 978 S.W.2d 505 (Mo.App. W.D.1998); *Newsom v. Newsom*, 976 S.W.2d 33 (Mo.App. W.D.1998). Here, the trial court weighed the evidence and determined that the children's best interest would be better served by its parenting plan than by Wife's or Husband's. While the increase in separation between the children and their half siblings is unfortunate, the children will be able to maintain a relationship with their half-siblings in times provided for in the court's parenting plan and as arranged between the parties, both of whom the record shows continue to support this relationship as much as possible.

The court's plan, giving each parent approximately equal parenting time and allowing for the alternating weekends to be arranged between the parties in order to allow the children maximum time with their half siblings, is supported by substantial evidence that such plan is in the best interests of the children. Thus, no error arises from the part-time sibling separation in this custody decision. Wife's third point on appeal is denied.

### Division of Property

■ A trial court has broad discretion in dividing marital property. *Farris v. Farris*, 75 S.W.3d 345, 347 (Mo.App. W.D.2002). The trial court's categorization of property as either marital or non-marital property will not be overturned unless the trial court abused its discretion. *Stidham v. Stidham*, 136 S.W.3d 74, 77 (Mo.App. W.D.2004). "Prenuptial agreements will be upheld and will dispose of issues of property division unless found to

be unconscionable." *Sprock v. Sprock,* 882 S.W.2d 183, 186 (Mo.App. W.D.1994).

 This Court "will only interfere with the trial court's division of property if the division is so unduly weighted in favor of one party as to constitute an abuse of discretion." *Henning v. Henning,* 72 S.W.3d 241, 245 (Mo.App. W.D.2002). A trial court has abused its discretion when its " 'ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *Nelson v. Nelson,* 25 S.W.3d 511, 516 (Mo.App. W.D. 2000) (quoting *Medlock v. Medlock,* 990 S.W.2d 186, 189 (Mo.App. S.D.1999)).

### Compensation

Wife argues in her fourth point on appeal that the trial court erred in failing to enforce the valid, specific, and unambiguous terms of the parties' premarital agreement regarding a compensation account and to impose a constructive trust, and instead rewriting the premarital agreement. In response, Husband argues that the trial court reached the correct result, although using the wrong reasoning, because the plain language of the premarital agreement indicates that its meaning was for any compensation remaining in the compensation account upon the dissolution of the parties' marriage to be divided equally. The trial court reached the same result, but using the following reasoning: (1) because Husband had deposited his marital compensation into his FSB account and thereby commingled his individual property with marital property, the FSB account transmuted into marital property; (2) the FSB account's new status as marital property held solely in Husband's name

was a status not foreseen or addressed by the premarital agreement, and (3) therefore, the FSB account was marital property to be divided under Missouri law. The trial court divided the remaining balance of the account evenly between the parties.

The premarital agreement addresses compensation in Paragraph 7:

The parties agree that all compensation earned by either of them after the date of the marriage as wages, salary, bonus or any other compensation-related payments, including income earned on any amounts accumulated from such payments (hereinafter "Compensation"), shall not be the Individual Property of either party pursuant to the provisions of this Agreement, but instead shall be Marital Property.[2] Compensation as defined hereunder shall not include any equity interest in a corporation, limited liability company or partnership, which interest was received in exchange for the investment of either party of his or her own Individual Property. *In the event of a dissolution of the parties' marriage, the Compensation of both parties shall be divided equally between the parties, regardless of the manner in which the account holding the Compensation is titled....* The parties agree that the Compensation of either party shall be placed into an account in the joint names of both parties and each agrees to take no action with respect to any such account without the consent of the other party, except that such consent shall be conclusively presumed if the party whose consent is required hereunder fails to object to the other party's unilateral action with respect to Compensation within 60 days after the

---

2. Although "Marital Property" is capitalized in the premarital agreement as if it has a specific meaning to be found elsewhere in the agreement, no definition is assigned to said term in the agreement.

nonconsenting party knew or had reason to know of such action.

(emphasis added).

 The premarital agreement is governed by Kansas law, pursuant to its choice of law provision. Thus the premarital agreement is a contract subject to the same law as any other contract and the unlimited review of an appellate court. Kan. Stat. Ann. § 23–2404 (Cum.Supp. 2011); *Shamberg, Johnson & Bergman, Chtd. v. Oliver,* 289 Kan. 891, 220 P.3d 333, 339 (2009). *In re Marriage of Strieby* summarizes Kansas law regarding the interpretation of contracts:

> When interpreting written contracts, courts must first ascertain the parties' intent. If the terms of the contract are clear, the parties' intent must be determined from the contract language without applying the rules of construction. When interpreting a contractual provision, it should not be done by isolating one particular sentence or provision. Courts must construe and consider the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.

45 Kan.App.2d 953, 255 P.3d 34, 41 (2011) (internal citations and quotations omitted). Issues not expressly addressed in the antenuptial agreement are decided in accordance with Missouri law. *Thomas v. Thomas,* 196 S.W.3d 57, 61–62 (Mo.App. W.D.2005).

 Here, the trial court found the premarital agreement was valid and enforceable, which the parties do not contest. Paragraph 7 governs compensation earned during the parties' marriage. All compensation earned during the marriage was earned by Husband, and all of it was deposited into his individual FSB account. Household expenses and all Wife's ex-

penses were paid using money taken from said account. The compensation account called for in the premarital agreement was not created; however, compensation earned became marital property pursuant to the premarital agreement, and was used as such throughout the duration of the marriage routinely to pay household expenses and for the needs of Wife and the children.

The amount remaining in Husband's FSB account at the time of the parties' dissolution of marriage was divided equally between the parties, which the trial court treated as being an outcome reached outside the dictates of the premarital agreement, but which this Court finds to be in keeping with the compensation provision in Paragraph 7 that "[i]n the event of a dissolution of the parties' marriage, the Compensation of both parties shall be divided equally between the parties, *regardless of the manner in which the account holding the Compensation is titled.*" (emphasis added).

Wife argues that because she was unable to discuss finances with Husband and did not earn any compensation herself during the marriage, she had no knowledge or reason to know that no compensation account was created or that any action took place with respect to compensation earned during the marriage. She argues that, because the premarital agreement required that no party take action with respect to the compensation account without the consent of the other party, or if the nonconsenting party made no objection within sixty days of knowing or having reason to know of the action his or her consent would be conclusively presumed, Husband should have placed all compensation earned in a jointly-titled account and taken no action with the funds therein without first discussing it with her. However, as pointed out by Husband, the clear

language of the agreement does not require that no action be taken with any compensation without a discussion between the parties, but rather reveals that consent would be presumed if the nonconsenting party did not object to action taken with compensation within sixty days.

Wife asserts that, because the parties lived comfortably on no compensation in the early part of the marriage, using the income from Husband's individual property to support their family, she had no reason to know that later the money Husband gave her to pay the family's expenses was coming from the compensation he later began earning from his work with Store.

It is a reasonable inference from the record, however, that Wife had reason to know that at least some of the family's many sizeable expenses were being funded by the compensation from Husband's employment with Store. The record shows Wife did not object to any of the expenses, much less within the sixty days prescribed by the agreement, thus the trial court could reasonably have concluded that Wife was conclusively presumed to have consented to the expenses coming from such compensation. Because the result reached by the trial court is supported by substantial evidence and the reasonable inferences therefrom, Wife's fourth point on appeal is denied.

### *Non–Marital and Marital Interests in Westover and Baltimore and Wife's Ten Percent Interest in Husband's Individual Contributions*

In wife's fifth point on appeal, she argues in three subparts that the trial court erred in incorrectly enforcing the premarital agreement by: (1) failing to award her ten percent of the non-marital equity in Westover and Baltimore, because the unambiguous language of the agreement did not exempt Husband's interest in West-

over and Baltimore non-marital equity from Wife's ten percent interest; (2) setting apart $284,121.90 as husband's non-marital contribution to Westover, because the evidence failed to establish that $284,121.90 was from Husband's individual property, and (3) failing to award her marital equity in Westover, because applying strict construction and the source of funds rule, a portion of the Westover equity was marital and should have been divided with Wife. Husband counters, arguing that (1) the unambiguous language of the premarital agreement exempted Husband's non-marital equity in Westover and Baltimore from Wife's ten percent interest, (2) the evidence established that Husband contributed $284,121.90 in individual property to the purchase of Westover, and (3) applying strict construction, no portion of the Westover equity was marital.

Paragraphs one and five are particularly relevant to analysis of the issues in Wife's fifth point:

1. Each party shall separately retain all rights in his or her Individual Property, and except as expressly provided otherwise herein, each party shall have the absolute and unrestricted right to dispose of such Individual Property during life and at death free from any claim of the other by reason of their marriage, and with the same effect as is no marriage between them had taken place. As used in this Agreement, the term "Individual Property" shall mean all property owned by MIKE or KATE, whether legal or equitable, real, personal or mixed, wherever located, including without limitation the income therefrom, increases in value thereof, proceeds from the sale thereof, and any reinvestment, which is not held by them together as joint tenants with right of survivorship or in tenancy by the entireties. Each party represents that the schedule

of his or her property attached to this Agreement is a full and complete disclosure of his or her Individual Property at the date of this Agreement.

5. In the event of a dissolution of the parties' marriage, KATE shall be entitled to an amount equal to ten percent (10%) of the fair market value of the Individual Property of MIKE on the date of the dissolution of the parties' marriage. Except as otherwise provided in the preceding sentence and in Paragraph 7: (a) neither party shall claim as marital property any Individual Property of the other, whether acquired before or after the marriage; (b) neither party shall make any claim for alimony, maintenance or the right to participate in or receive distributions from any pension, profit sharing or other employee benefit or retirement plans of the other; (c) if any property is owned by the parties together as joint tenants with right of survivorship or held in tenancy by the entireties, each party shall receive one-half of such property, except to the extent that a party establishes that such property, or any portion thereof, came from a contribution by such party of his or her Individual Property or from any earnings received by him or her during the marriage in which case such party shall be entitled to such property or such portion thereof; and (d) this Agreement shall be incorporated by reference in any decree of divorce or dissolution, and shall become a part thereof.

For the sake of clarity, Wife's subpoints are addressed out of sequence.

## I. $284,121.90 as Husband's non-marital contribution to Westover

The trial court found that Westover was titled as tenants by the entireties, subjecting it to Paragraph 5(c) of the premarital agreement. Thus, pursuant to Paragraph 5(c), Wife and Husband would receive one-half of Westover, except to the extent that one of the parties established that such property, or a portion thereof, came from a contribution of his or her individual property (as defined in the premarital agreement) or from earnings received by him or her during the marriage, which would entitle such party to *that portion of the property.* The court found, and Wife does not contest, that Husband contributed $514,929.14 of his individual property toward the acquisition of Westover by way of funds wired at closing from his Schwab account. The trial court also found, which Wife contests, that Husband contributed $284,121.90 of his individual property to refinance Westover by way of funds which, although they came from the FSB account, were traced to the proceeds from Husband's sale of Fairway, which was his individual property.

The trial court's finding that Husband contributed $284,121.90 of his individual property toward the refinancing of Westover is based on its reasoning that "[a]lthough these funds were paid from the FSB account, credible evidence was presented at trial tracing these funds from the proceeds of [Husband]'s sale of [Fairway], which was his Individual Property." Wife's argument that the evidence "failed to establish that $284,121 was from Husband's individual property" is based on her reasoning that the subject $284,121 came from the FSB account, which the court found had been transmuted into marital property.

The record reveals that Fairway was sold in August 2006, and the net proceeds from the sale were $335,103, which Husband deposited into the FSB account that month. Westover was refinanced on October 12, 2006, using $284,121.90 from the FSB account. Along with husband's testimony that he intended to use the proceeds

from the Fairway sale for the Westover refinance, the court found this evidence sufficient to show that the $284,121.90 contributed from the FSB account to refinance Westover was Husband's individual property.

■ There is a general presumption that the court found the evidence in accordance with the judgment reached. *Belcher v. Belcher*, 106 S.W.3d 601, 604 (Mo.App. W.D.2003); Rule 73.01(c). "[T]he owner's intent to convert the property to marital property is the determining factor" in the evaluation of whether particular portions of commingled property are marital or separate. *In re Marriage of Thomas*, 199 S.W.3d 847, 863 (Mo.App. S.D.2006). Accordingly, here, this Court presumes the trial court found Husband's testimony credible and interpreted it to mean that he did not intend the proceeds from Fairway to be transmuted into marital property in the FSB account, but rather to remain separate and be used for the refinancing of Westover. This Court views this evidence and the trial court's reasonable inference therefrom in the light most favorable to the verdict and disregards all contrary evidence. *Owsley*, 186 S.W.3d at 814. Thus the judgment of the trial court as to finding that the $284,121.90 contributed from the FSB account to refinance Westover was Husband's individual property is affirmed. As a result, pursuant to the premarital agreement, Husband was to receive credit for a contribution of individual property in the total amount of $799,051.04 toward the purchase of Westover. We address the manner in which Husband's credit to "that portion of the property" should have been calculated in subpart three.

**II. Construction of the Premarital Agreement—Failure to award Wife ten percent of the non-marital equity in Westover and Baltimore**

■ The trial court found in a footnote that although the premarital agreement generally entitled Wife to receive ten percent of the fair market value of Husband's individual property valued at the time of dissolution,

> paragraph 5c contains an exception to this general proposition and provides that a party who can establish that he/she contributed Individual Property for acquisition of joint property is entitled to claim or retain such interest in said acquired joint property. Therefore, pursuant to the Agreement, [Wife] is *not* entitled to an allocation of 10% of this portion of [Husband]'s Individual Property.

The trial court thus concluded that Wife was not entitled to ten percent of the fair market value of Husband's individual property contributed to Westover[3] or to Baltimore.[4] The trial court's conclusion is erroneous. Paragraph 5 of the premarital agreement begins by stating that, in the event of dissolution, Wife *is* entitled to ten percent of Husband's individual property. The sentence that follows states that the preceding sentence applies to the remainder of that paragraph, creating an exception to each of the provisions that follow in the amount of ten percent of any individual property mentioned, to be awarded to Wife. The exception in Paragraph 5, subpart (c) is to the language of subpart (c) itself, the language allocating jointly held property half to each party, not to the rule

3. The fair market value of Husband's individual property contributed to Westover was $799,051.04, as discussed. *Supra.*

4. The trial court found the fair market value of Husband's individual property contributed to Baltimore to be $198,650.01—a finding that Wife does not contest.

allocating ten percent of all Husband's individual property to Wife.

■ The provision allocating ten percent of all Husband's individual property to Wife applies to all parts of Paragraph 5, as indicated in the second sentence thereof: "Except as otherwise provided in the preceding sentence...." In interpreting premarital agreements, "[e]ach term is construed to avoid an [e]ffect which renders other terms meaningless: a construction which attributes a reasonable meaning to all of the provisions of the agreement is preferred to one which leaves some of them without function or sense." *In re Marriage of Busch,* 310 S.W.3d 253, 261 (Mo.App. E.D.2010) (internal quotation and citations omitted). It is unreasonable to interpret Paragraph 5 as the trial court did, because to do so would render the language "Except as otherwise provided in the preceding sentence" meaningless, leaving that sentence without function or sense. As such, Wife is entitled to ten percent of the fair market value as of the time of dissolution of Husband's individual property contributions to Westover and to Baltimore.

Although the trial court erred in construing the premarital agreement to exempt Husband's individual property contributions to jointly titled real property from Wife's ten percent interest in all of Husband's individual property, for reasons discussed in subpart three of this point, the trial court's judgment in this regard will not be reversed.

## III. Construction of the Premarital Agreement—Failure to Properly Value Husband's Individual Property Contributions to Westover and Baltimore and Apply the Source of Funds Rule

■ Wife claims that the trial court erred in failing to award her marital equity in Westover, because applying strict construction and the source of funds rule, a portion of the Westover equity was marital and should have been divided with Wife. Wife argues that the language in Paragraph 5, which exempts property or a portion thereof from equal division between the parties if a party can establish that it is individual property, "does not set forth the method for compensating the contributing party for his/her individual portion," and thus, strict construction requires that the issue be decided in accordance with Missouri law. Wife's complaint essentially challenges the trial court's construction of the phrase "shall be entitled to such property or such portion thereof" as used in paragraph 5(c) to describe the "credit" either party was to receive against jointly titled property for individual property contributions. Though the trial court used the same process to calculate Husband's credit for both Westover and Baltimore, Wife's complaint on appeal is limited to Westover.

Paragraph 5, subpart (c) states that

to the extent that a party establishes that [property held as joint tenants with right of survivorship or held in tenancy by the entireties], or any portion thereof, came from a contribution by such party of his or her Individual Property or from any earnings received by him or her during the marriage ... such party shall be entitled to such property or such portion thereof.

Wife correctly points out that the premarital agreement makes no provision for how the credit for individual property contributed toward a "portion" of jointly titled property should be computed. In crediting Husband's individual property contribution toward Westover, the trial court started with the fair market value of the property at the time of dissolution without regard to marital debt against the property, then subtracted the full amount of Hus-

band's contribution from this fair market value on a dollar for dollar/first dollars out basis, without regard to whether the "value" of Husband's cash contribution could be equated as of the time of dissolution to an identical "value" in Westover. The trial court's process for allocating interest in the property disregarded that the property to be divided pursuant to paragraph 5 of the premarital agreement necessarily meant the property available for division, and thus the property net of marital debt.[5] The parties agreed that the equity in Westover as of dissolution was $631,135.02, significantly less than its "fair market value," as the property was subject to marital debt. Thus, the trial court should have been calculating Husband's share of the equity in Westover, and not Husband's share of the fair market value in Westover.

In addition, the trial court's process for allocating interest in the property disregarded that the value of Husband's contribution of individual property to Westover as of the date of dissolution was not the amount of that contribution, but was instead a function of the "portion of the property," (that is to say, a portion of the equity), the contribution represented. Only in this manner would a party's individual contributions toward jointly titled property be properly credited or discounted by changes in the value of the property. The calculation of the value, as of the date of dissolution, of contributed individual property toward the acquisition of jointly titled property requires application of the source of funds rule.

The formula for the source of funds rule as explained in *In re Marriage of Herr,* 705 S.W.2d 619, 625 (Mo.App. S.D.1986), is applicable in the instant case to compute the portion of individual property contributed by Husband to Westover and the portion of marital property contributed to Westover:

This formula and its definitions are as follows:

$$\text{nonmarital property} = \frac{nmc}{tc} \times e$$

$$\text{marital property} = \frac{mc}{tc} \times e$$

Nonmarital contribution (nmc) is defined as the equity in the property at the time of marriage, plus any amount expended after marriage by either spouse from traceable nonmarital funds in the reduction of mortgage principal, and/or the value of improvements made to the property from such nonmarital funds. Marital contribution (mc) is defined as the amount expended after marriage from other than nonmarital funds in the reduction of mortgage principal, plus the value of all improvements made to the property after marriage from other than nonmarital funds.

Total contribution (tc) is defined as the sum of nonmarital and marital contributions.

Equity (e) is defined as the equity in the property at the time of distribution. This may be either at the date of the decree of dissolution, or, if the property has been sold prior thereto and the proceeds may be properly traced, then the

---

5. The trial court seemingly understood this principle as it appropriately assigned the marital debt for both Westover and Baltimore as a part of its division and equalization of marital assets and liabilities. In fact, the trial court noted in the judgment that it was required to divide the marital debt against Westover and Baltimore in this fashion because the premarital agreement did not dictate the division of debt on the property. In light of this recognition, it is even more apparent that the "property" to be divided pursuant to paragraph 5(c) of the premarital agreement was the equity portion of jointly titled property, and not its fair market value inclusive of marital debt.

date of the sale shall be the time at which the equity is computed. *Hill v. Hill,* 747 S.W.2d 718, 720 (Mo.App. W.D.1988); *In re Marriage of Herr,* 705 S.W.2d 619, 625 (Mo.App. S.D.1986) (internal citations omitted). Once these amounts are properly calculated they shall be divided in accordance with the premarital agreement.

individual property $= \dfrac{\$799,051.04}{\$840,187.04}$ x $631,135.02
$600,234.33

marital property $= \dfrac{\$41,136.00}{\$840,187.04}$ x $631,135.02
$600,234.33

For Westover, the nonmarital contribution by Husband was $799,051.04, and the marital contribution was $41,136, consisting of a $30,000 escrow payment and $11,136 in mortgage reduction payments. The equity in Westover at the time of trial was $631,135.02. Thus, the appropriate source of funds calculation for interests in *Westover* is as follows:

Pursuant to paragraph 5 of the premarital agreement, Wife is entitled to half the marital property (0.5 × $30,900.71) and ten percent of Husband's individual property (0.1 × $600,234.33) in Westover, for a total interest in Westover of $75,473.79. This contrasts with the $72,974.49 allocated to her pursuant to the trial court's application of an erroneous formula for allocating interests, a difference of $2,499.30.

Because the difference between the trial court's allocation of interest in Westover and the allocation pursuant to the premarital agreement calculated using the source of funds rule is *de minimis,* in the context of the total property allocated to Wife in this dissolution, the trial court's judgment in this regard is affirmed. *See Appling v. Appling,* 156 S.W.3d 454, 458 (Mo.App. E.D.2005) ("This court is not to reverse a judgment unless error was committed materially affecting the merits of the action. The [error] requires reversal of the division of marital property if the error *materially impacts the overall distribution* of marital property.") (emphasis added) (internal citations omitted); *Judy v. Judy,* 998 S.W.2d 45, 53 (Mo.App. W.D.1999) (finding an automobile valued at $4,000 did not materially impact the overall distribution of marital property where over $200,000 in property was distributed between the two parties).[6]

Furthermore, it would be unreasonable and unjust to apply the source of funds rule to Westover to increase Wife's share of the property division and leave unchanged the court's allocation of interests in Baltimore were identical errors were committed by the trial court in its allocation of interests.[7] To do so would leave

---

**6.** "De minimis non curat lex—the law is not concerned with trifles—is a maxim of the common law." *Goad–Ballinger Post 69 v. McNeill,* 716 S.W.2d 300, 304 (Mo.App. W.D. 1986) (citing *Lambert v. Hartshorne,* 65 Mo. 549, 551 (1877)); *See also Woodbury v. Portland Marine Society,* 90 Me. 18, 37 A. 323, 325 (1897) ("Equity does not stoop to pick up pins.").

**7.** Interestingly, Wife does not argue for application of the source of funds rule to the calculation of interests in Baltimore. For Baltimore, Husband's individual contribution was found to be $198,650.01. No finding was made as to a marital contribution, but based upon the trial court's finding that the $10,500 earnest money deposit was not individual property and based on Husband's Exhibit 244 (Baltimore Exhibit F), reflecting the three $1,853.71 monthly mortgage payments made between the purchase of the home and the parties' dissolution, the marital contribution appears to be $16,061.13 at a maximum. The court found the equity in the property

Wife in a significantly better position than would proper application of the source of funds rule to Baltimore. In light of the trial court's overall treatment of the properties, the distribution to Wife was not unjust or unreasonable.

Wife's fifth point is denied.

## *Valuation of Furniture in Wife's Possession*

■ Wife argues in her sixth and final point on appeal that the trial court erred and abused its discretion in assigning a value of $50,000 to the furniture awarded to her, because there was no evidence to support such valuation. Husband, on the other hand, argues that the finding was supported by substantial evidence. Husband argues that because Wife's proposed division of assets, submitted to the court as Petitioner's Exhibit 8, listed furniture valued at $75,000, divided it in half to reach the amount of $37,500 to be awarded her, Wife thereby admitted possession of furniture whose value was $37,500 at the Baltimore property. He then argues that Wife's testimony at trial that Husband should be credited for the $12,000 to $14,000 in money he had given her to purchase additional furniture for Baltimore accounts for the difference between the $37,500 that Wife "admitted to having in furniture" and the $50,000 the trial court found was in her possession.

Wife's listing the total value of the furniture of the parties at $75,000 and proposing that the court allocate half that value

to her in the dissolution does not constitute admission that she was in possession of $37,500 worth of furniture at Baltimore. Wife's testimony that Husband should be credited for the money he provided her to purchase furniture for Baltimore does not indicate that there was $12,000 to $14,000 worth of furniture in Wife's possession at Baltimore beyond what was listed in her Petitioner's Exhibit Number 2 having a value of $17,281.

Instead, Husband testified that Wife used a joint account to purchase several thousand dollars worth of furniture when she moved into Baltimore, then used his American Express account to purchase "probably $10,000 worth." This Court defers to the trial court's determinations of credibility and views the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's judgment. *Owsley*, 186 S.W.3d at 814. Because the trial court determined Husband's testimony to be credible and inferred from it that Wife was in possession of $50,000 worth of furniture, its finding is supported by substantial evidence. Wife's sixth point on appeal is denied.

## CONCLUSION

The judgment of the trial court is reversed in part and the case is remanded for the trial court to enter a judgment that includes the following language in the parenting plan: "The children shall be in Mother's custody at all times not specifi-

to be $211,846.08. Thus, proper source of funds calculation for the Baltimore property would be:

| | | | |
|---|---|---|---|
| individual property $195,999.27 | = | $198,650.01 / $214,711.14 | x $211,846.08 |
| marital property $15,846.81 | = | $16,061.13 / $214,711.14 | x $211,846.08 |

Pursuant to the premarital agreement, Wife is entitled to half the marital property (0.5 × $15,846.81) and ten percent of Husband's individual property (0.1 × $195,999.27) in Bal-timore, so her total interest in Baltimore would be $27,523.34 under this calculation, in contrast with the $133,174.99 allocated to her pursuant to the trial court's calculation.

cally assigned to Father." The remainder of the judgment is affirmed.

All concur.